SKELLY OIL COMPANY *v.* JOHNSON.

4-7843                                    194 S. W. 2d 425

Opinion delivered April 15, 1946.

Rehearing denied June 10, 1946.

1108

*J. E. Gaughan, A. R. Cheatham, S. E. Gilliam, C. E. Wright, J. K. Mahony, Harry Crumpler, H. S. Yocum, Emon A. Mahony* and *A. F. House,* for appellant.

*McRae & Tompkins* and *McKay & Anderson,* for appellees.

ED. F. McFADDIN, Justice. This appeal involves the title to the surface and to the minerals of three 40-acre tracts in Columbia county. Even though the tracts are contiguous, there are different matters concerning the title of each; so it will make for clarity to consider each tract separately.

### Tract No. 1—SE¼, NW¼, Sec. 35

Before detailing the onset and result of the litigation in the chancery court, and before considering the questions here at issue, we will give, by numbered paragraphs, the history of the title of this tract up to the trial in the chancery court.

### Title History of Tract No. 1.

1. Calvin Mower is the common source of title, to both the surface and the minerals. On November 1, 1918, Mower conveyed the surface and the minerals to Frank Doss by warranty deed, with a vendor's lien reserved by Mower, in the deed, to secure the balance of the pur-

chase money. This balance was evidenced by a series of eleven notes, each for a different amount, due serially and annually on November 1st of each year 1919 to 1929, inclusive. The notes (but not the deed) provided that failure to pay any note at maturity would mature the entire series. The deed from Mower to Doss was duly recorded on December 6, 1918.

2. On April 4, 1921, Doss executed a deed purporting to convey to F. K. Couch an undivided one-half interest in and to all oil, gas and other minerals in and under the land. This deed was duly recorded on April 5, 1921, and is referred to herein as "the Couch mineral claim." F. K. Couch died intestate in 1937, and his widow and heirs are parties to this litigation. In 1941, they executed oil and gas leases to S. G. Jean, who in turn assigned the leases to Skelly Oil Company. Jean and Skelly Oil Company are parties to this litigation.

3. On May 24, 1921, Doss executed a deed purporting to convey to F. W. Henker an undivided one-half interest in and to all oil, gas and other minerals in and under the land. This deed was duly recorded on July 7, 1921. Henker has made partial conveyance of some of his mineral interests to Birnbach. Both Henker and Birnbach are parties to this litigation; and their claim is hereinafter referred to as "the Henker-Birnbach mineral claim."

4. On August 24, 1921, Doss executed a deed purporting to convey to Miss Bettie McMorella an undivided 39/40ths interest in and to all oil, gas and other minerals in and under the land. This deed was duly recorded on August 27, 1921. Again, on September 3, 1921, Doss executed a deed purporting to convey to Miss Bettie McMorella an undivided 19/40ths interest in and to all oil, gas and other minerals in and under the land; and this deed was duly recorded on September 3, 1921. On February 21, 1944, Miss Bettie McMorella conveyed to C. M. Crumpler all her right, title and interest in and to the oil, gas and other minerals in and under this land. Miss McMorella and C. M. Crumpler are both parties to this

litigation and their claim is referred to hereinafter as "the McMorella-Crumpler claim."

5. Some time prior to October, 1923, Calvin Mower filed suit against Frank Doss, in the Columbia chancery court, to foreclose the vendor's lien retained in the deed from Mower to Doss as mentioned in paragraph 1, *supra*. Frank Doss was the sole defendant in that suit. No grantee from Doss was made a party. The decree of October 23, 1923, recites that eight of the original vendor's lien notes were filed in the cause. It will be recalled that there were originally *eleven* of these notes. At the foreclosure sale, under the decree, the lands were purchased by Mower for the amount of the eight notes as stated in the decree. The sale was reported to, and approved by, the court; and Mower received, on January 29, 1924, the duly approved commissioner's deed, which was duly recorded on May 2, 1924. There is nothing in the record before us to show that any *lis pendens* notice was ever filed showing this foreclosure proceeding.

6. Some time prior to October, 1927, Calvin Mower departed this life, testate, a resident of the State of Illinois. His will was recorded in Columbia county, Arkansas, in 1928. His widow, as beneficiary under the will, executed a general warranty deed dated June 12, 1929, purporting to convey the lands to Clarendon Mower. This deed neither excepted nor mentioned the minerals, and was duly recorded on January 7, 1930.

7. On January 29, 1930, Clarendon Mower executed a general warranty deed to Camille Lombardo, purporting to convey tract No. 1, and neither mentioning nor reserving the minerals. This deed was not recorded until August 19, 1939; and the delay in recording is worthy of note. On February 14, 1945, S. G. Jean (one of the parties to this litigation, as previously mentioned) obtained a quitclaim deed from Camille Lombardo, which deed was duly recorded on March 2, 1945. The claim of Jean under this deed is called "the Lombardo claim."

8. The minerals were never separately assessed until 1935, when Miss Bettie McMorella assessed a part of the minerals in her name; and she has paid the taxes

for such minerals, so assessed, each year from 1935 through 1944. The taxes on the land were regularly paid through 1929, but the state and county taxes were unpaid and delinquent on this land for 1930; and at the collector's delinquent tax sale, held on June 8, 1931, R. S. Foster purchased the land for the delinquent taxes of 1930. Foster received and recorded, on June 15, 1933, a clerk's tax deed, purchasing, and holding title, for Foster-Grayson Lumber Co., a partnership composed of Foster, Grayson and Lee, each of whom is a party to this litigation. The claim of this partnership (under this tax sale, tax deed, possession, and the instrument mentioned in paragraph No. 9, next below) is referred to herein as "the Foster-Grayson claim"; and the partnership and its members will be referred to as "Foster-Grayson."

9. On July 5, 1935, Clarendon Mower (the grantor in the deed to Camille Lombardo mentioned in paragraph No. 7 above) executed a quitclaim deed to Foster-Grayson; but the correspondence between Mower and Foster-Grayson shows that Mower at all times informed Foster-Grayson that Mower had previously conveyed away all of his interest in this land.

10. In April, 1936, Foster-Grayson, as first parties, contracted to sell to I. C. Johnson the land herein, "excepting and reserving to first parties and heirs and assigns an undivided one-half interest in all oil, gas and mineral rights in said land . . ." Johnson immediately went into possession of the land, and has so remained; and, having paid in full the contract price, Johnson received from Foster-Grayson a quitclaim deed on April 24, 1943, purporting to convey the land, but with the same reservation of oil, gas and minerals as recited in the contract, and as just quoted. This quitclaim deed was duly recorded on January 12, 1945; and on the same date Johnson and wife executed to J. B. Warmack an oil and gas lease on the half of the minerals claimed by Johnson. Warmack is a party to this litigation, along with Johnson and wife; and their mineral claim is called "the Johnson mineral claim." Johnson's claim to the surface is called "the Johnson surface claim."

*This Litigation*

The above is a chronological history of the title. Now, for the onset and result of the litigation, which we give in lettered paragraphs.

A.   On January 24, 1945, Johnson and wife and Warmack filed suit in Columbia chancery court, claiming that Johnson owned all the surface and one-half of the minerals of this tract of land, and that Warmack was the lessee of Johnson on the minerals. Plaintiffs claimed title beginning with the 1931 tax sale and clerk's tax deed to Foster-Grayson (mentioned in title history, paragraph No. 8), the quitclaim deed of Clarendon Mower to Foster-Grayson (mentioned in title history, paragraph No. 9), the contract and deed from Foster-Grayson to Johnson (mentioned in title history, paragraph No. 10), and the continued adverse, etc., possession of Johnson from 1936 to the filing of the suit. Claiming that Foster-Grayson owned the remaining one-half interest of minerals in this land, plaintiffs prayed that the following claims be canceled as clouds on the plaintiff's title, to-wit: the Couch mineral claim and the Skelly lease referred to in title history, paragraph No. 2, *supra;* the Henker-Birnbach mineral claim referred to in title history, paragraph No. 3, *supra;* the McMorella-Crumpler mineral claim referred to in title history, paragraph No. 4, *supra;* the Lombardo claim as referred to in title history, paragraph No. 7, *supra.*

B.   Foster-Grayson intervened and set up title to the half of the minerals reserved in the deed to Johnson, claiming the said minerals by the same chain of title as deraigned by Johnson and Warmack; and Foster-Grayson sought relief against the same parties as prayed by Johnson and Warmack.

C.   In appropriate pleadings, the defendants named in the complaint and intervention (*i.e.,* Couch claim, Henkler-Birnbach claim, McMorella-Crumpler claim, and Lombardo claim) set up their respective claims and defenses which we will not detail here, as these will be discussed in this opinion.

D. A trial in the chancery court resulted in a decree awarding the plaintiffs and interveners the full relief sought; and each and all of the defendants have appealed. All appellants united in one abstract; and then each filed a separate brief. Also, there is the issue between the McMorella-Crumpler claim as against the Couch mineral claim and the Skelly Oil Co. leases.

## Opinion

We now proceed to dispose of the questions concerning this tract in six Roman-numbered topic headings as follows: I—Effect of mineral deeds by Doss. II—Effect of, and result from, Mower's omission to make the record-title claimants as parties to the 1923 foreclosure suit. III—The 1931 tax sale for the delinquent taxes of 1930. IV—The quitclaim deed from Clarendon Mower to Foster-Grayson. V—The asserted right of the junior title claimants to yet redeem from the 1923 foreclosure. VI—The McMorella claim v. the Couch claim.

I. *Effect of Mineral Deeds by Doss.* We start with the surface and mineral interests united in Mower when he conveyed to Doss in 1918. In 1921, Doss executed various mineral deeds to Couch, Henkler, and McMorella, conveying all of the minerals. In fact, on the face of the record, these mineral conveyances covered 98/40ths of the minerals, but this overselling will be mentioned later. The effect of these mineral deeds being placed of record was to constitute a constructive severance of the minerals from the surface and to make two titles: one, the surface, and the other the mineral title. There is both legislative and judicial recognition of such constructive severance. Section 13600, Pope's Digest, recognizes that a conveyance of minerals—as distinguished from the surface—constitutes a constructive severance from the surface of such conveyed minerals; and a tax sale of the surface (land) does not carry the minerals. This court in a long line of cases has recognized and declared the rule ·of constructive severance of the minerals from the surface. One such case is *Huffman v. Henderson Co.*, 184 Ark. 278, 42 S. W. 2d 221. In that case we said:

"We have held, . . . that a conveyance of the mineral or the timber rights, or a reservation of such rights in a deed conveying the surface rights, creates, in one case and reserves in the other, a separate estate, and the statutes quoted (§§ 9855 and 9856, Crawford & Moses' Digest) make this estate separately taxable. *Bodcaw Lumber Co.* v. *Goode,* 160 Ark. 46, 254 S. W. 345, 29 A. L. R. 578; *Claybrooke* v. *Barnes,* 160 Ark. 678, 22 S. W. 2d 390, 67 A. L. R. 1436."

It is therefore clear that when the mineral deeds executed by Doss were placed of record, such recordation constituted a constructive severance of the minerals from the surface.

II. *Effect of, and Results from Mower's Omission to Make the Record-Title Claimants as Parties to the 1923 Foreclosure Suit.* When Mower conveyed the entire surface and mineral title to Doss in 1918, Mower reserved a vendor's lien for the payment of the balance of the purchase money. In 1921, Doss executed the mineral deeds to Couch, Henker and McMorella. The holders of these mineral deeds were junior title claimants to Mower. In some cases such persons are called "junior lienors"; but the more apt expression is "junior title claimants." When Mower foreclosed he failed to make these junior title claimants as parties to the suit. They therefore had a right to redeem their respective mineral interests from the foreclosure sale, just as a junior lienor has such a right to redeem when omitted from the foreclosure suit of the senior lienor.

We have held that when a senior mortgagor fails to make a junior mortgagor a party to the foreclosure suit, the junior mortgagor has the "right to redeem." One of our cases so holding is *Dickinson* v. *Duckworth,* 74 Ark. 138, 85 S. W. 82, 4 Ann. Cas. 846. In that case the appellee, Duckworth, had failed to make the appellants (Dickinson and Sikes) parties to the foreclosure suit. The question arose as to what were the rights of the said appellants, who were junior lienors. Mr. Justice McCulloch, speaking for this court, said:

"It must be conceded that appellants were necessary parties to the foreclosure suit under which appellee Duckworth obtained title, and their rights in the property were not cut off by the sale. Having been omitted from the foreclosure proceedings, what remedy, therefore, remained to them in the assertion of their rights? A right merely to redeem from the lien which had been foreclosed, upon the payment of the debt, or the right to require a foreclosure order and a sale thereunder? While there is some conflict in the authorities, we think that by the decided weight of authority it is settled that a subsequent lienor, or holder of the equity of redemption, after foreclosure against the original mortgagor, can only claim the right to redeem, where he has been omitted from the foreclosure suit. Wiltsie, Mortg. Foreclosures, § 160; *Wiley* v. *Ewing,* 47 Ala. 418; *Corpentier* v. *Brenham,* 40 Cal. 221; *Hodgen* v. *Guttery,* 58 Ill. 431; *Gower* v. *Winchester,* 33 Iowa 303."

The rule of *Dickinson* v. *Duckworth* has been applied in *Longino* v. *Ball-Warren Comm. Co.,* 84 Ark. 521, 106 S. W. 682; *Harrison* v. *Bank of Fordyce,* 178 Ark. 760, 12 S. W. 2d 400; and *Foster* v. *Taylor,* 187 Ark. 172, 58 S. W. 2d 675. Likewise, we have held that when the subsequent grantee of the mortgagor is not made a party to the foreclosure proceedings brought by the senior mortgagee, then such subsequent grantee has a right to redeem. *Purcell* v. *Gann,* 113 Ark. 332, 168 S. W. 1102; *Prouty* v. *Guaranty Loan & Trust Co.,* 174 Ark. 19, 294 S. W. 362.

This rule of "right to redeem" was applied to a junior mineral claimant in the case of *Rowland* v. *Griffin,* 179 Ark. 421, 16 S. W. 2d 457, which presented a situation most similar to the case here. In *Rowland* v. *Griffin* the facts were: In 1920, Alderson and wife, as owners, executed a mortgage to Rowland, which was promptly recorded; in 1921, Alderson and wife executed to Griffin a deed for 1/8th of all minerals, and the mineral deed was promptly recorded; in 1923, Rowland foreclosed his mortgage, but failed to make Griffin a party to the foreclosure suit; Rowland purchased at the foreclosure

sale and obtained a deed; in 1926, Griffin instituted suit against Rowland to redeem his mineral interest. This court held that Griffin had a right to redeem, and had not lost the right by laches in that case. The opinion by Mr. Justice Wood is lucid and scholarly.

In the case at bar, it is clear that the only effect of the omission of the mineral claimants from the 1923 fore-closure suit was to give such omitted junior title claimants the right to redeem. The difficulty arises when we are called on to say for how long a time this right to redeem continued to exist. We have no statute covering this specific right to redeem, and our cases say that equity will allow redemption "within a reasonable time." What is "reasonable" depends on the pleas interposed, and the facts and equities in each case. If a junior title claimant had actual knowledge of the foreclosure proceedings and thereafter suffered a change of circumstances to occur, then, on a plea of laches, a short period might be reasonable. In *Rowland* v. *Griffin, supra,* there was a plea of laches, but the junior title claimant showed that he had no knowledge of the foreclosure proceedings; and knowledge or notice is sometimes an ingredient to the plea of laches. 21 C. J. 210.

In the case at bar, there are no facts showing laches. At the time of the trial there was a producing well off-setting this land, but there was never any oil activity of consequence on or near this land until after 1943. In the absence of circumstances supporting a plea of laches, we think the equitable rule of stale demand would afford the best guide for determining a reasonable time, in the event that the senior mortgagee resists redemption. In 21 C. J. 211 it is stated:

"A stale demand or claim in its proper sense is one that has for a long time remained unasserted; one that is first asserted after an unexplained delay of such great length . . . as to create a presumption . . . that it has been abandoned. . . . It is an inherent doctrine of jurisprudence that nothing less than conscience, good faith, or reasonable diligence can call courts of equity into activity, and they will not grant aid to a

litigant who has negligently slept on his rights and suffered his demand to become stale, where injustice would be done by granting the relief asked." See *Davis* v. *Harrell,* 101 Ark. 230, 142 S. W. 156; and *Hill* v. *Wade,* 155 Ark. 490, 244 S. W. 743. See, also, 30 C. J. S. 521. A junior title claimant cannot close his eyes and ears for an indefinite time and thereby be heard to say that he never knew of the foreclosure and so did not have to exercise his right to redeem.

In the light of this principle of stale demand, let us examine the facts here: in the deed from Mower to Doss the eleven notes were listed as due serially and annually, from November 1, 1919, to and including November 1, 1929. There was no provision in the recorded deed stating that the maturity of the notes could be accelerated by failure of Doss to make any payment. If any of the junior title claimants had examined the record, such a one could have presumed that the Mower deed would not be totally past due until November 2, 1929, and that the last of the mortgage notes would not be barred by limitations until November 2, 1934; but by November 2, 1934, if no marginal indorsement had been made, or if no suit had been filed, then the deed of Mower would have been apparently barred by limitations. So a junior title claimant purchasing the mineral deed from Doss before the foreclosure could reasonably have presumed from the record that such purchaser would, until November 2, 1934, be in danger of foreclosure by Mower. It seems that in analogy to the period of limitation of Mower's right to foreclose, the junior title claimants could not claim a right of redemption from the senior claim of Mower for a period of time longer than the greatest extent of the period of limitation of the senior claim of Mower as shown by the record when the junior title claimants received their deeds. This is applying the rule of stale demand in analogy to the period of limitations allowing the senior mortgagee to act as disclosed from the face of the record when the junior title claimants acquired their interest. This seems equitable, since equity, in applying stale demand, frequently does so in analogy to the statute of limitations. 21 C. J. 251, and 19 Am. Juris

345. We therefore hold that under the facts in this case the junior title claimants had a right of redemption until November 2, 1934. In other words, Mower, by his foreclosure, set in operation against the junior title claimants the running of the equitable principle of stale demand, and the junior title claimants had until November 2, 1934, to exercise the "right to redeem"; and until that time their mineral interests would not have been lost to Mower under his foreclosure and their failure to redeem.

In stating that the junior title claimants would have lost their interest to Mower on November 2, 1934, we are not giving any weight to the holdings of the Louisiana Supreme Court to the effect that a mineral estate is a mere servitude to the surface estate, and may be lost by non-user. Such a Louisiana case is *Frost-Johnson Lumber Co.* v. *Sallings,* 150 La. 756, 91 So. 207. Our holdings are entirely contrary to the Louisiana holdings on this point. As stated by Chief Justice McCULLOCH in *Bodcaw Lumber Co.* v. *Goode,* 160 Ark. 48, 254 S. W. 345, 29 A. L. R. 578, we hold that a mineral estate is not a mere servitude, but is a separate estate and may exist in perpetuity and "is not lost by non-user nor by adverse occupancy of the owner of the surface under the same claim of title, and that the statute can only be set in motion by an adverse use of the mineral rights, persisted in and continued for the statutory period." Minerals constructively severed are subject to separate sale for taxes. See § 13600, Pope's Digest. We are not weakening the holding in *Bodcaw Lumber Co.* v. *Goode, supra,* and other similar cases, when we hold, as we do here, that a junior title claimant may lose his right and title by failure to exercise his right to redeem within a reasonable time.

Now, all this discussion, about when the junior title claimants, in the case at bar, would have lost their right to redeem, is only for the purpose of showing that the right to redeem had not been lost at the time of the tax sale in 1931 or the tax deed in 1933 as discussed in section III, *infra.* As between the junior title claimants herein and Jean (the holder of the Mower title), there is a stipu-

lation concerning redemption as shown in section V, herein. The learned chancellor, in rendering the decree herein, was of the opinion that the tax sale in 1931 carried the mineral interest of the junior title claimants; and we have dwelt at length on this point to demonstrate that the minerals were still constructively severed from the soil until several years after the 1931 tax sale.

We may, therefore, sum up the points, on the effects of and results from Mower's omission to make the record title claimants parties to the 1923 foreclosure suit, as follows: (a) the junior title claimants had only the right to redeem; (b) this right existed for a "reasonable" time before it was lost; (c) while it existed, the minerals were still constructively severed from the surface; (d) at the expiration of the reasonable time the purchaser at the foreclosure—or his grantee—acquired the right and therefore the title of the junior title claimants; (4) under the facts in this case the junior title claimants continued to have the right to redeem until November 2, 1934. Thus, the minerals at all times remained constructively severed from the surface until November 2, 1934.

III. *The 1931 Tax Sale for the Delinquent Taxes of 1930.* The basis of the Foster-Grayson claim and also the Johnson claim to the minerals in this land is the 1931 tax sale and the tax deed issued in pursuance thereof. Section 13600, Pope's Digest, (so far as involves mineral rights) is a copy of § 9856 of Crawford & Moses' Digest. These sections result from Act No. 30 of 1897 and Act No. 221 of 1929. Section 13600, Pope's Digest, reads as follows:

"When the mineral rights (and) or timber rights in any land shall, by conveyance or otherwise, be held by one or more persons, and the fee simple in the land by one or more other persons, it shall be the duty of the assessor when advised of the fact, either by personal notice, or by recording of the deeds in the office of the recorder of the county, to assess the mineral rights (and) or timber rights in said lands separate from the general property therein. And in such case a sale of the mineral rights (and) or timber rights for non-payment of taxes

shall not affect the title to the land itself, nor shall a sale of the land for non-payment of taxes affect the title to the mineral rights (and) or timber rights. When any mineral rights (and) or timber rights assessed as above set out, become forfeited on account of non-payment of taxes, same shall in all things be certified to and redeemed in the same manner as is now provided for the certification and redemption of real estate upon which taxes duly assessed have not been paid.''

When the tax sale was held in 1931 for the taxes of 1930, the minerals under this land had been constructively severed from the surface and the mineral holders still had a right to redeem, which kept alive the constructive severance, so all that was sold at the tax sale was the surface rights; and that was all that Foster purchased. The tax sale and deed are the basis of the Foster-Grayson claim, and the Johnson claim. There were many irregularities in the tax sale, and it was voidable. But in 1933 (while the minerals were still constructively severed) Foster received the tax deed which contained a sufficient description to constitute color of title, and which supports the claim of Johnson to the surface, but not the claim of Foster-Grayson and Johnson to the minerals. (This matter of the tax sale will be mentioned in discussing tract No. 3, *infra.*)

The case at bar is similar to the case of *Huffman* v. *Anderson Co.*, 184 Ark. 278, 42 S. W. 2d 211. In the cited case this court was construing § 9856 of Crawford & Moses' Digest which, in so far as here involved, is identical to § 13600, Pope's Digest; and we held in the cited case that after a mineral deed had been placed of record and the minerals constructively severed from the surface, then the subsequent tax purchaser received only the surface and not the minerals. That is the identical situation here. Foster-Grayson received only color of title to the surface. The effect of § 13600, Pope's Digest, on § 13873 makes it certain that the only rights that passed to Foster-Grayson were surface rights.

Adverse possession of the surface can never, in itself, constitute adverse possession of constructively severed

minerals. To constitute adverse possession of such minerals, there must be continuous use of the minerals for the statutory period. Even sporadic use is not sufficient. *Claybrook* v. *Barnes,* 180 Ark. 678, 22 S. W. 2d 390. Adverse possession of the surface by Foster-Grayson and Johnson, for however long continued, would never, in itself, ripen into adverse possession of the minerals. If, after the tax sale, any junior title claimant had wanted to redeem the minerals from the foreclosure sale, then such junior title claimant would have been obliged to seek out Calvin Mower or his successors in title, in order to effect such redemption. We have repeatedly held that adverse possession of the surface can never in itself make adverse possession of the minerals. To constitute adverse possession of the minerals, there must be continuous user of the minerals for the statutory period. Even sporadic user is not sufficient. *Claybrook* v. *Barnes,* 180 Ark. 678, 22 S. W. 2d 390, 67 A. L. R. 1436.

To sum up: the effect of the tax deed in 1933 based on the voidable 1931 tax sale was to give Foster-Grayson color of title to the surface only; and with the junior title claimants still holding their right of redemption, and the mortgagee and his grantee holding the right of the mineral claimants after the expiration of the period of redemption.

IV. *The Quitclaim Deed from Mower to Foster-Grayson Lumber Co.* Evidently, recognizing this situation as detailed in III, *supra,* Foster-Grayson undertook to obtain a deed from Mower. A valid deed from Mower to Foster-Grayson would have allowed Foster-Grayson "to stand in the shoes of Mower," and to assert against the junior title claimants that they had lost the right to redeem. 42 C. J. 379. But Mower clearly and frankly advised Foster-Grayson that he had transferred his title to someone else. Foster-Grayson was buying from Mower several hundred acres of land in Columbia county, Arkansas, and in the deed included the land here involved. The correspondence is in the record, and it shows, beyond peradventure of a doubt, that when Foster-Grayson received from Clarendon Mower, in 1935, the quitclaim deed to the land here involved, Foster-Grayson accepted the deed

with knowledge that Mower had transferred his title to another. This knowledge is equal to or greater than the notice that would have been accomplished if the deed from Mower to Camille Lombardo had all the time been of record. *Brown* v. *Hanauer*, 48 Ark. 277, 3 S. W. 27. A person taking a deed with knowledge of a prior unrecorded deed to another is in the same situation as though the prior deed had all the time been of record. *Halbrook* v. *Lewis*, 204 Ark. 579, 173 S. W. 2d 171.

The effect of our recording and constructive notice statutes (§§ 1846-47, Pope's Digest) is to deny protection to subsequent purchasers who already have knowledge of a prior deed. As is said in 39 Am. Juris., 234: "Of course when a person knows of a thing he has 'notice' thereof, as no one needs notice of what he already knows. In other words, actual knowledge supersedes a requirement of notice." See, also, *St. L.-San Francisco R. R. Co.* v. *State*, 179 Ark. 1128, 20 S. W. 2d 878. So, Foster-Grayson, in taking the quitclaim deed from Mower did so with knowledge that Mower had already transferred his rights to another; and that knowledge prevents Foster-Grayson, and its grantee, Johnson, from being the beneficial grantee from Mower, to the extent of asserting stale demand against the junior title claimants.

The end of the whole matter, so far as Foster-Grayson is concerned, is that it never had, and does not now have, any minerals in and under the 40 acres here involved. Likewise, the plaintiff Johnson never had, and does not now have any minerals in and under the 40 acres here involved. Johnson does own the surface of this tract because of continuous adverse, etc., possession since 1936. We do not recite the acts of adverse possession of the surface, because we do not understand that Johnson's claim to the surface is seriously questioned. The serious matter is who owns the minerals; and this we will now discuss.

V. *The Asserted Right of the Junior Title Claimants to yet Redeem from the 1923 Foreclosure.* In section II, *supra*, we stated that the right of these mineral holders to redeem would not have been lost until November

2, 1934. That was demonstrated to show that the 1931 tax sale did not carry the minerals. Subsequent negotiations between the junior title claimants and the successors in title of Mower have extended the redemption period for the junior title claimants. It will be recalled that Calvin Mower's widow and beneficiary executed a deed to Clarendon Mower, who, in turn, executed a deed to Camille Lombardo in 1930 (before the tax sale); and she conveyed to Jean in 1945. The effect of these conveyances was to pass to each grantee, in turn, the rights of Mower as against the junior title claimants. 42 C. J. 379. So, if the junior title claimants are to redeem from anyone, then such a one now is S. G. Jean, who is a party to this suit. In the abstract made by all of the appellants in this court (and Jean, the Couches, Henkler, Birnbach, McMorella, and Crumpler are such appellants), there is this statement on page 10:

"As Jean obtained a deed from Camille Lombardo Becker, he, of course, succeeded to all of the equities of Calvin Mower, deceased, but there is no controversy between him and the other appellants; and if appellants prevail he will permit them to redeem their mineral interests from the foreclosure sale."

By this statement, it is evident that Jean has agreed (1) that he will not claim limitations, laches, stale demand, or any other such plea against the junior title claimants, and (2) that he will allow them to redeem from him, even though their rights would be lost if he should interpose the appropriate plea. We see no reason why Jean could not make such an agreement; and with this agreement by Jean in the record, it necessarily follows that the Henker-Birnbach claimants are entitled to one-half the minerals as against all parties except Jean, and are entitled to redeem from Jean under the quoted language. The Crumpler and McMorella claimants have conceded in the briefs that the Henkler-Birnbach claimants are entitled to half the minerals. The ownership of the remaining one-half of the minerals is dependent on the dispute between the McMorella title and the Couch title, which we now discuss.

VI. *The McMorella Title v. Couch Title.* This is a substantial controversy in itself, and requires considerable detailing of facts. As was stated in paragraphs number 2, 3 and 4 of the title history, *supra,* Doss executed: (a) a deed to Couch on April 4, 1921, covering half of the minerals; (b) a deed to Henker on May 24, 1921, covering half of the minerals; and (c) two deeds to Miss Bettie McMorella (dated August 27, 1921, and September 3, 1921, respectively) covering 58/40ths of the minerals; and Miss McMorella has conveyed to Crumpler. Doss had apparently conveyed all of his minerals before he made either of the conveyances to Miss McMorella. So, on the face of the record, Doss had nothing to convey to Miss McMorella. She and Crumpler conceded that Henker received half of the minerals because his deed was of record prior to Miss McMorella's deed; but she joins with her grantee, Crumpler, in an attack on the mineral deed from Doss to Couch because of alleged equities and matters known to Couch, and which prevented him (and therefore his heirs) from owning the minerals purporting to have been conveyed in the deed from Doss to Couch. Regarding her own conveyances from Doss to her, reciting 58/40ths of the minerals, Miss McMorella claims that the fractions used in her deeds were placed there by her lawyer through inadvertence. She and Crumpler only claim one-half of the minerals, and that claim is against the Couch heirs. The chancery court held against the Crumpler-McMorella parties, and they have appealed, seeking: (a) to have the Couch minerals vested in Crumpler; and (b) to set aside the oil and gas leases executed by the Couches and now held by Skelly Oil Co.

Miss McMorella testified: that Frank Doss was a negro who lived in the same community (Mohawk) where she operated a store for several years before and after 1921; that Doss consulted with her about the Couch mineral transaction; that she discussed the matter with Couch; that after Couch agreed that he had no interest or claim under his purported deed, then Miss McMorella took her two deeds and expended money and paid taxes in reliance on Couch's statement that he had surrendered

his claim. The Crumpler-McMorella parties thus presented an issue of estoppel against the Couch heirs; and, in effect, claim that Couch was only a trustee for Doss in the mineral conveyances, and that the Couch heirs should be decreed as having held the mineral title in trust for Miss McMorella, since she claims by conveyance from Doss.

There are some facts (supported by documents) which stand out like mountains and which substantiate the McMorella-Crumpler claim. We mention them:

(1) The mineral deed from Doss to Couch was dated April 4, 1921. There was introduced in evidence an instrument reading as follows:

### "AGREEMENT

"April 4, 1921

"By and between F. K. Couch and Frank Doss:

"Whereby F. K. Couch agrees to pay a certain land note now held by Farmers Bank, Emerson, Arkansas, of about $144, also to pay to Frank Doss the difference between $500 and the amount of this note. Frank Doss agrees to deliver to F. K. Couch mineral deed to one-half interest in 80 acres of land located as follows: SE¼ of NW¼ and SW¼ of NE¼ all in Sec. 35, Township 19, R. 20. This balance payment is due and payable upon opinion of attorney that Frank Doss has right to convey this mineral deed. This agreement will expire should more than sixty days be consumed in completing same unless by consent of both parties or unless some court proceeding must be used in clearing this title or unavoidable delays.

"F. K. Couch

"Witness

"John McNeill, Jr."

This instrument shows that Couch's right to the mineral deed was not only dependent on payments to be made, but would expire in sixty days unless certain things happened, to-wit, attorney approved title, or court

proceedings caused delays. John McNeill, Jr. (who witnessed Couch's signature to this instrument), is not a litigant in the present proceedings, and is apparently a disinterested witness. McNeill testified that he and Couch were partners in 1921, and that McNeill had a silent interest in this Doss transaction; that Couch and McNeill were unable to find a buyer for the minerals and never did fulfill their agreement with Doss; that shortly before this suit, McNeill made a quitclaim deed to Crumpler to attest the fact that Couch and McNeill had never fulfilled their agreement with Doss. The written agreement supports McNeill's testimony.

(2) Miss Bettie McMorella claimed that, to protect her mineral interest, she paid three of the vendor's lien notes that Doss executed to Mower. She introduced in evidence the original note from Doss to Mower due November 1, 1920, and also the one due November 1, 1921, but she could not find the other note which she claimed she paid in 1922. When we remember that there were eleven original vendor's lien notes, and that in the foreclosure suit in 1923 only eight notes were claimed by Mower to be unpaid, then the fact that Miss McMorella had two of the original notes which she introduced in evidence, affords substantial support to her testimony that she paid the notes in reliance on her mineral claim. Certainly, she would not have made such payments with the Couch title valid and outstanding.

(3) Beginning in 1935 and continuing through 1944, Miss McMorella assessed in her name, and paid a tax on, part of the minerals under this land—as distinct from the surface. This assessment and payment does not constitute adverse possession, but does show a continued claim for Miss McMorella to a portion of the minerals. The certificate was introduced in evidence, showing the assessment and payment of these taxes on the mineral interest.

These three numbered items supported by documentary proof lend full support to the testimony of the disinterested witness—McNeill—to the effect that F. K.

Couch never claimed any interest in the minerals after the failure by Couch and McNeill to fulfill their part of the written agreement with Doss as previously copied herein. This leads to our conclusion, that Couch held the legal title to these minerals as a mere trustee for Doss and for Miss McMorella, Doss' grantee; and that Couch's heirs should not prevail against the claim of Crumpler, grantee of Miss McMorella.

But during the time that Couch held the legal title to the minerals as trustee, he died; and his widow and heirs made the leases to Jean, who assigned to Skelly Oil Co. There was nothing of record to notify Jean, Skelly Oil Co., or anyone else, that the Couch heirs were other than true owners of the interests shown by the record. So Skelly's lease is valid against Crumpler. This is because of the rule that a constructive trustee conveys a good title to an innocent third person who buys for value and without notice or knowledge of imperfections or secret equities affecting the power of the trustee. *Woodrow* v. *Riverside Greyhound Club*, 192 Ark. 770, 94 S. W. 2d 701, and cases there cited. See, also, 54 Am. Juris. 209, *et seq.* It follows, therefore, that the Skelly leases are valid, but all the mineral interest of the Couch widow and heirs—remaining after the Skelly leases—is divested from the Couch widow and heirs and quieted in Crumpler, grantee of McMorella.

### Tract No. 2, SW¼ NE¼ Sec. 35

The title history of this tract is identical with Tract No. 1 down to and including paragraph No. 9 in the title history of tract No. 1. The litigation on this tract is the same as detailed in paragraphs B, C and D in the litigation history of tract No. 1. Foster-Grayson has made no conveyance of this tract; and therefore claims all of the surface as against Jean, and claims all of the minerals as against Couch, Henker, Birnbach, McMorella, Jean, and Skelly Oil Co. All of the questions concerning the ownership of this tract have been discussed in the opinion in tract No. 1; so, we may succinctly apply those holdings to this tract.

Mineral ownership: Since Jean has agreed to redemption as heretofore stated, then, after such redemption, the minerals in tract No. 2 are decreed to be owned: one-half by Henker and Birnbach; the other one-half by Crumpler, but subject to the oil and gas leases held by Skelly Oil Co.

Surface ownership: Jean challenges (1) the validity of the clerk's tax deed of 1933 to Foster-Grayson, and (2) the nature and character of Foster-Grayson's possession of the land. These contentions of Jean will be considered and answered when we discuss tract No. 3, *infra*. The chancery court held that Foster-Grayson had acquired title to the surface of tract No. 2; and we affirm that holding.

### Tract No. 3, NW¼ NE¼ Sec. 35

On this tract we give the title history and litigation history before announcing our opinion.

### *Title History*

1. Calvin Mower is the common source of title to both the surface and the minerals. Some time prior to October, 1927, he departed this life testate, a resident of Illinois. His will was recorded in Columbia county, Arkansas, in 1928. His widow, as beneficiary under the will, executed a general warranty deed to Clarendon Mower, dated June 12, 1929; and the deed was duly recorded on January 7, 1930, and did not reserve any minerals.

2. On January 29, 1930, Clarendon Mower executed a general warranty deed to Camille Lombardo, which deed was not recorded until August 19, 1939, and which contained no reservation of minerals. On February 14, 1945, Camille Lombardo executed a quitclaim deed to S. G. Jean, which deed was recorded on March 2, 1945, and contained no reservation of minerals.

3. The state and county taxes were unpaid and delinquent for the year 1930; and at the collector's delin-

quent tax sale, held on June 8, 1931, R. S. Foster purchased the land for said delinquent taxes. Foster received and recorded, on June 15, 1933, a clerk's tax deed (under § 13872, *et seq.*, Pope's Digest) which contained a valid legal description of the land. Foster purchased and held title for Foster-Grayson Lumber Co.; a partnership which has been previously described herein, and which is referred to as Foster-Grayson.

(4) On July 5, 1935, Clarendon Mower (the grantor in the deed to Camille Lombardo mentioned in paragraph 2 of this title history) executed a quitclaim deed to Foster-Grayson, who took with knowledge that Mower had previously parted with his title.

### This Litigation

In seeking to have quieted its title to the surface and minerals as against the claim of Jean, Foster-Grayson claimed: (a) under the tax sale of 1931, (b) the tax deed of 1933, (c) the two-year statute of limitation (§ 8925, Pope's Digest), (d) the payment of taxes for seven years on wild and unenclosed lands under § 8920, Pope's Digest, and (e) actual possession under § 8918, Pope's Digest. In resisting the Foster-Grayson intervention, Jean claimed: (a) that the tax sale was void for irregularities, (b) that the tax deed was void on its face, (c) that there was no actual possession of the land by Foster-Grayson, and (d) that the constructive possession by tax payments was not sufficient under the facts in the case. The chancery court entered a decree granting Foster-Grayson full relief, and Jean has appealed.

### Opinion

At the outset, we point out that there has never been any constructive or actual severance of the minerals from the surface insofar as this tract is concerned; so § 13600, Pope's Digest, has no application. The owner of the surface is also the owner of the minerals insofar as this tract is concerned.

I. *The Tax Deed of 1933 Was Color of Title.* Jean insists that the tax sale in 1931 was void for various rea-

sons, and in this we agree; but the invalidity of the tax sale does not prevent the tax deed from being color of title. *Charis* v. *Henry*, 205 Ark. 163, 168 S. W. 2d 610; *Bradbury* v. *Dumond*, 80 Ark. 82, 96 S. W. 390, 11 L. R. A., N. S., 772.

Jean contends that the clerk's tax deed, issued in 1933 on the 1931 tax sale, was void on its face because several tracts were included in the deed for which a gross amount was shown. This contention is settled against Jean by § 13887, Pope's Digest, which is Act 235 of 1927. This act was before this court in the case of *Evans* v. *F. L. Dumas Store, Inc.*, 192 Ark. 571, 93 S. W. 2d 307; and Mr. Justice BUTLER, in disposing of an identical contention, said: "It is next contended that the tax deed is void on its face because several tracts of land were included in the deed for which a gross amount was paid. This objection would be well taken under the rule announced in *Cocks et al.* v. *Simmons*, 55 Ark. 104, 17 S. W. 594, 29 Am. St. Rep. 28, and *Campbell* v. *Sanders*, 138 Ark. 94, 210 S. W. 934, but for the fact that this rule has been changed by statute now found as § 10108, Castle's 1927 Supplement to Crawford & Moses' Digest, which permits one owning more than one certificate of purchase, or having a certificate of purchase for more than one tract of land purchased at any one sale to have included in one deed any number of such tracts sold at the same sale."

Jean also contends that the said clerk's tax deed is void because it recites that the land was sold for the taxes of 1931, instead of 1930. But this defect does not prevent the deed from being color of title. In *Nixon* v. *Norton-Wheeler Stave Co.*, 207 Ark. 838, 183 S. W. 2d 300, Mr. Justice KNOX said: "We are convinced that the deed from the Commissioner of State Lands to appellee's predecessor in title was color of title notwithstanding the fact that it recited a forfeiture and sale for the year 1922, a year when because of the forfeiture for the previous year title was already apparently in the state, and the land apparently not taxable because of such fact. *Beard* v. *Dansby*, 48 Ark. 183, 2 S. W. 701; *Osceola Land Co.* v. *Chicago Mill & Lbr. Co.*, 84 Ark. 1, 103 S. W. 609; *Holub*

v. *Titus,* 120 Ark. 620, 180 S. W. 218; *Black* v. *Brown,* 129 Ark. 270, 195 S. W. 673; *Schmeltzer* v. *Scheid,* 203 Ark. 274, 157 S. W. 2d 193; *Riddle* v. *Williams,* 204 Ark. 1047, 166 S. W. 2d 893. The state deed here being regular on its face was sufficient to constitute color of title although it might have recited forfeiture for taxes due for wrong year. *Culver* v. *Gillian,* 160 Ark. 397, 254 S. W. 681; *Hunt* v. *Boyce,* 176 Ark. 303, 3 S. W. 2d 342.''

We have repeatedly held that a deed, based on a void tax sale, but on the face of the deed describing the land, and purporting to convey it, is color of title within the two-year, as well as the seven-year statute of limitation. *Bradbury* v. *Dumond,* 80 Ark. 82, 96 S. W. 390; *Osceola Land Co.* v. *Chicago Mill & Lumber Co.,* 84 Ark. 1, 103 S. W. 609; *Black* v. *Brown,* 129 Ark. 270, 195 S. W. 673; *Culver* v. *Gillian,* 160 Ark. 397, 254 S. W. 681; *Hunt* v. *Boyce,* 176 Ark. 303, 3 S. W. 2d 342; *Kilpatrick* v. *Kilpatrick,* 204 Ark. 452, 162 S. W. 2d 897.

II. *The Nature and Extent of Foster-Grayson's Possession.* The chancery court made detailed findings; and, regarding this tract No. 3, said: ''The tax record shows various irregularities, but the deed is not void on its face, and is therefore color of title. I. C. Johnson went into possession of a portion of this property under permission of Foster-Grayson, and his possession was their possession, and after two years from the date of the tax deed, that possession ripened into a valid title. The interveners paid the taxes on these lands for eleven or twelve years which would also vest a legal title in them.''

Johnson testified that, as tenant of Foster-Grayson, he fenced, and used for pasture purposes only, eighteen acres of this tract; that he continued this possession from 1936 until 1940; that thereafter the pasture fence completely disappeared; and that no part of the land was ever in cultivation, but was uncultivated timber. Such is the extent of the evidence regarding actual possession. Foster-Grayson paid the taxes on this tract, before they were past due, each year from 1934 to 1944.

If the extent to which the land was used for pasture purposes from 1936 to 1940 was sufficient to constitute "actual adverse possession" (which we do not decide), then the chancery court was correct in awarding the land to Foster-Grayson under § 8925, Pope's Digest. If the extent to which the land was used was not "actual adverse possession" under § 8925, then when the fences disappeared from the land in 1940 and only uncultivated timber remained, the land became "wild and uninclosed" within the purview of § 8920, Pope's Digest; and the payment of taxes for seven years would be constructive possession.

In Gaither v. Gage, 82 Ark. 51, 100 S. W. 80, we held that payment of taxes on wild and uninclosed land for less than seven years could be joined with immediate subsequent actual possession of the land to make the full statutory period. In other words, actual possession may be tacked to constructive possession. See, also, Miller v. Chicago Mill & Lbr. Co., 140 Ark. 639, 215 S. W. 900. Applying the principle of these cases to the case at bar, it is clear that the chancery court was correct in awarding this tract No. 3 to Foster-Grayson; and that part of the decree is affirmed.

### Conclusion

As regards tract No. 3, the decree of the chancery court is affirmed in awarding the surface and minerals to Foster-Grayson.

As regards tract No. 1 and tract No. 2, the decree of the chancery court is reversed, and the cause remanded with directions to enter a decree in accordance with this opinion.

This, being an equity case, we are free to determine the costs in conformity with equity; and we adjudge all the costs of both courts against the parties, as follows: Jean—4/12ths; Foster-Grayson—5/12ths; Johnson and Warmack—1/12th; Couch widow and heirs—2/12ths.