Robert J. MIDDLETON, Robert E. Middleton, Richard B. Griffin, and Bradley W. Kidder, Plaintiffs,

v.

WESTERN COAL AND MINING COMPANY, a Corporation, Missouri Improvement Company, a Corporation, and the Missouri Pacific Railroad Company, a Corporation, Defendants.

Civ. A. No. 1799.

United States District Court
W. D. Arkansas,
Fort Smith Division.
May 21, 1965.

Dobbs, Pryor & Dobbs, Ft. Smith, Ark., for plaintiffs.

Smith, Williams, Friday & Bowen, Little Rock, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

This action was commenced May 13, 1964, by the plaintiffs in the Sebastian

Chancery Court, Greenwood District, of Arkansas. The action was timely removed by the defendants June 2, 1964.

The defendant Western Coal and Mining Company (hereinafter called Western) is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business at St. Louis. The defendant Missouri Improvement Company (hereinafter referred to as Improvement) is a Missouri corporation with its principal place of business at St. Louis. The defendant Missouri Pacific Railroad Company is a Missouri corporation with its principal place of business at St. Louis. The plaintiffs Robert J. Middleton, Robert E. Middleton, Richard B. Griffin and Bradley W. Kidder are citizens of the State of Arkansas and residents of Sebastian County. The court has jurisdiction of the action by virtue of the diversity of citizenship of the parties and the amount in controversy, 28 U.S.C. § 1332.

The plaintiffs in their complaint alleged that Robert J. Middleton and Floy Middleton, husband and wife, purchased certain real property in the Greenwood District of Sebastian County on February 28, 1945. On October 2, 1962, Robert J. Middleton entered into a contract of sale with Robert E. Middleton, Richard B. Griffin and Bradley W. Kidder to sell this property for the purpose of subdividing, improving and resale as residential and commercial lots. Pursuant to this agreement the property was subdivided and platted and a bill of assurance filed. Prior to the above described transactions the plaintiffs' predecessors in title, Franklin Bache and Nannie T. Bache, his wife, on April 2, 1904, conveyed to Western "all and singular the coal, fire clay and other minerals contained within and underlying" the property involved in the instant controversy.[1]

It is further alleged in the plaintiffs' complaint that, although the deed to Western was executed more than 60 years ago, at no time has Western or its corporate successor, Improvement, made any effort to mine coal, fire clay or other minerals, nor has Western or its successor, Improvement, purported to exer-

---

1. The deed recites:

"Together with the right to dig, mine, carry away, use and dispose of the said coal and fire clay and other minerals, to brush down and take up slate, sandstone and other obstructions to mining said coal, without impeachment of waste, and to construct, erect, maintain and use underground passageways to adjacent lands, to use the flowing water on said land, and also so much of the surface of the said above described real estate as the said Western Coal and Mining Company or its assigns may in its discretion from time to time deem necessary or convenient in the mining of said coal, fire clay and other minerals, for the purpose of shafts, buildings, erections, right of way for railroad tracks, telegraph, telephone, electric power and light and pipe lines and for all purposes necessary or convenient in working of said coal, fire clay and other minerals hereby conveyed, including the right of ingress, egress and regress for all purposes whatsoever connected with the operation of said mines.

"Provided, that so much of the surface of said grounds as the Western Coal and Mining Company, its successors or assigns, may at any time elect to take under the provisions of this deed it shall pay to the said Franklin Bache, his heirs, executors, administrators or assigns, an amount of money to be agreed on between the parties hereto. And in the event that the parties hereto do not agree upon the amount to be paid within ten (10) days after the said Western Coal and Mining Company, its successors or assigns, has notified the said Franklin Bache, his heirs, executors, administrators or assigns, in writing of its desire to purchase any of the aforesaid surface, then the price shall be determined by a third party to be selected by the United States Judge for the Western District of Arkansas, and the decision of the party so appointed shall be binding on the parties hereto; and, upon the payment of said amount of money, the said Franklin Bache, his heirs, executors or administrators, shall convey, or cause to be conveyed, to the said Western Coal and Mining Company, its successors or assigns, by good and sufficient deed or deeds of general warranty with the usual covenants, a fee simple title in and to so much of the surface of said lands as the said Western Coal and Mining Company or its successors or assigns may so elect to take."

cise its option under the "elect to take" the surface of said property. In the concluding sentence of paragraph 7 of the plaintiffs' complaint it is alleged that the provision "elect to take" the surface of the property constitutes a cloud upon the marketability of the surface of said real estate to the extent that it is rendered virtually unmarketable.. It is alleged that the plaintiffs have made substantial improvements on said property and placed it upon the market for sale as residential and commercial lots. That the plaintiffs did find ready, willing and able purchasers for said property, but sales, however, were not consummated for the reason that lending institutions declined to finance the sales because of the perpetual option contained in the April 2, 1904, deed to Western on the grounds that it constituted a cloud upon the plaintiffs' title to the surface. That since that time the property has been totally unmarketable.

In paragraph 9 of the complaint the plaintiffs alleged that the perpetual option in the April 2, 1904, deed is null and void for the following reasons:

"(a) It is too vague, uncertain and indefinite to constitute a binding option.

"(b) It fails to specify a time limit in which the said option is to be exercised; and in the event a reasonable time is to be inferred as the limit, then said reasonable time has expired.

"(c) It is an unlimited or perpetual option which violates the rule against perpetuities.

"(d) It is inherently inequitable in that it totally destroys the merchantability of plaintiffs' title to the surface of said property.

"(e) Defendants have failed to use due diligence in the exploration, development and working of the premises.

"(f) Defendants have permitted plaintiffs to make improvements upon the surface of said property and otherwise act in a manner wholly inconsistent with any purported right which defendants might claim under said perpetual option, and defendants are now estopped from asserting any rights thereunder.

"(g) Defendants are barred by laches from asserting any purported rights under the said provision.

"(h) The purported option to take the surface of said property is not necessary or required for the purpose of mining the coal, fire clay or other minerals underlying said property for the reason that defendants have other access to said minerals through the surface of adjacent lands owned by defendants herein."

In paragraph 10 of the plaintiffs' complaint it is alleged that Missouri Pacific is the successor in title to a purported right-of-way across this property; that although Missouri Pacific did at one time maintain railroad tracks across said property, they were removed several years ago, the exact date of removal not being known to the plaintiffs. That the Missouri Pacific removed all tracks, ties, rails and bridges along said right-of-way, and thereby wholly and completely abandoned any interest, right or ownership. That the right-of-way also constitutes a cloud upon the title to the surface of this property.

In paragraph 11 of the plaintiffs' complaint the plaintiffs alleged that the Bache deed did not convey oil and natural gas by the use of the words "other minerals" in the April 2, 1904, deed. That although the legal and commercial usage of the term "other minerals" in the Greenwood District of Sebastian County, Arkansas, did not include oil and natural gas at the time the deed was executed, the words "other minerals" constitute a cloud upon the title to the oil and gas underlying the property.

The prayer of the complaint is (1) that the court construe the April 2, 1904, deed to include the right to conduct underground mining only; (2) that the court declare the perpetual option in the April 2, 1904 deed to be null and void, and the court remove same as a cloud upon the plaintiffs' title, or, in the alternative, require the defendants to elect whether they will exercise the option to use the surface, and if defendants elect to exercise said option that they be required to designate which portion of the surface will be used, and that the defendants be required to pay compensation for their interest as their interest may appear; (3) that this court declare the right-of-way in favor of St. Louis, Iron Mountain and Southern Railway Company, and its successor, Missouri Pacific Railroad Company, abandoned, and that the court remove same as a cloud upon the plaintiffs' title; (4) that this court construe the words "other minerals" in the April 2, 1904, deed to include only solid minerals and to exclude oil and natural gas; that. the words "other minerals" be removed as a cloud upon the plaintiffs' title, and that Robert J. Middleton be declared the sole and exclusive owner of the oil and natural gas underlying said property exclusive of any claims by Western and Improvement and their successors and assigns.

The defendants in their answer generally deny the allegations of the plaintiffs' complaint, although they admit the execution of the April 2, 1904, deed. They deny that the plaintiffs have alleged any grounds upon which they are entitled to relief, and defendants further pray that the plaintiffs' complaint be dismissed.

On February 3, 1965, the parties, through their respective attorneys, filed a stipulation of facts, which contains the following:

"2.

"On April 2, 1904, the Western Coal and Mining Company purchased from Franklin Bache and Nannie T. Bache, his wife, 'all and singular the coal, fire clay and other minerals contained within and underlying' certain real property situated in Sebastian County, Arkansas, described as follows:

[description omitted]

"A copy of the deed dated April 2, 1904, and filed of record in Deed Record Book 33, page 387, on April 4, 1904, is attached to this stipulation, and the parties agree that the said copy is true and correct.

"3.

"The deed of April 2, 1904, referred to in the preceding paragraph contained a certain provision following the granting clause with which we are particularly concerned in this lawsuit as follows:

[herein quoted the April 2 1904, deed in Footnote 1.]

"4.

"On November 1, 1904, Franklin Bache and Nannie T. Bache, his wife, conveyed the property described in paragraph 2 above to John F. Clay. John F. Clay died in 1936, and by the terms of his will title to the property passed to his wife Sally C. Clay. Sally C. Clay died in either 1941 or 1942, and pursuant to her will title to the property passed to her sons, John Clarence Clay and James E. Clay. On February 28, 1945, James E. Clay and John Clarence Clay, together with their respective wives, conveyed to Robert J. Middleton and Floy Middleton, husband and wife, three hundred and twenty acres of said land described as follows:

[description omitted]

"Floy Middleton died in March, 1954, and Robert J. Middleton became the sole owner of the above described property as survivor.

"5.

"On October 8, 1962, Robert J. Middleton and Hester J. Ringo Middleton, his wife, entered into a sales

contract with Robert E. Middleton, Richard B. Griffin and Bradley W. Kidder in which Robert J. Middleton agreed to sell the said three hundred and twenty acres (situated on Rye Hill several miles south of the city of Fort Smith, Arkansas) to these persons for the sum of $500.00 per acre for the purpose of 'development, resale, subdivision and for other purposes.' Deeds to the surface of the property would be delivered as the property was sold to purchasers following subdivision and development. Bradley W. Kidder, Richard B. Griffin and Robert E. Middleton employed James D. Mickle, a registered engineer, to survey, subdivide and prepare a plat for a 12.70 acre subdivision known as Montclair Acres No. 1 situated in the northwest corner of Middleton property. On November 6, 1962, these persons filed a Bill of Covenants Assurance for Montclair Acres No. 1, which was recorded in Deed Record Book 162, page 178, in the Greenwood District of Sebastian County, Arkansas. The development costs to these plaintiffs at this time totaled $1525.79 for the following items: drilling well, $317.-27; engineering fees, $443.12; labor, $89.00; advertising, $4.85; abstract, $48.00; legal fees, $20.00; septic tank, $100.00; tile, $20.60; hole digger and operator, $200.00; building supplies, $282.95.

"6.

"Pursuant to the sales contract referred to in the preceding paragraph Richard B. Griffin, Bradley W. Kidder and Robert E. Middleton purchased from Robert J. Middleton lot one in Montclair Acres No. 1, and Robert J. Middleton executed a warranty deed on that date conveying said lot one to Virgil Afton Embry and Mary Ann Embry, subject to title examination. The Embrys submitted an application to the Farmers Home Administration for a loan to build a house on lot one in Montclair Acres No. 1, and the loan was approved, subject to title examination. When the abstract was examined by the attorney for the Farmers Home Administration, title was determined to be defective for the reason that the provision in the deed of April 2, 1904, to the Western Coal and Mining Company, its successors or assigns, giving to them the right to purchase the fee simple title to the surface of the property constituted a cloud on the title of the plaintiffs to the surface. For this reason the application for the loan was denied. There have been no sales of any portion of the property since that time, and the status of the parties remains the same.

"7.

"For the purpose of this lawsuit only, the defendants admit that Robert J. Middleton is the sole owner of the surface to the three hundred and twenty acre tract described in paragraph 4 above, subject only to such rights as defendants may have to the surface of said land and to 'all and singular the coal, fire clay and other minerals contained within and underlying' said land under the terms of the deed to the Western Coal and Mining Company dated April 2, 1904. For the purpose of this lawsuit only the plaintiffs admit that the Missouri Improvement Company is the owner of the coal, fire clay and other solid minerals (not oil and gas) underlying said property, but they deny that the deed of April 2, 1904, granted any legal right to use or purchase the surface.

"8.

"The defendants have not attempted to exercise the disputed right to 'elect to take' the surface of said property or any part thereof under the terms of the deed dated April 2, 1904.

"9.

"On June 14, 1887, V. W. King, a predecessor in title to the said

three hundred and twenty acres described in paragraph 4 above, executed a right of way deed to the St. Louis, Iron Mountain and Southern Railway Company (recorded in Deed Book 6, page 501, on July 27, 1887) in which a right of way for the purpose of a railroad track was granted to said railroad company across land situated in Sebastian County, Arkansas, described as follows:

[description omitted]

"The Missouri Pacific Railroad Company is the successor to the St. Louis, Iron Mountain and Southern Railway Company and succeeded as the owner of the assets of the St. Louis, Iron Mountain and Southern Railway Company, including the right of way across said property. The Missouri Pacific Railroad Company did at one time maintain a railroad track across said property under the terms of the right of way deed dated June 14, 1887. The Missouri Pacific Railroad Company on April 7, 1958, filed an application with the Interstate Commerce Commission requesting that agency to permit it to abandon the Greenwood branch line, which crossed the property here involved. On June 17, 1958, the Interstate Commerce Commission rendered a decision permitting the Missouri Pacific Railroad Company to abandon the Greenwood branch line, including the right of way over the property here involved, and pursuant thereto the Missouri Pacific Railroad Company removed all of the track, ties, rails and bridges thereon. The parties stipulate that this court should decree in its final order herein that the Missouri Pacific Railroad Company and the St. Louis, Iron Mountain and Southern Railway Company have abandoned any and all rights of way over the property owned by the plaintiffs and that all of the right, interest, title and ownership of the defendants, their successors and assigns, therein have been extinguished."

On February 17, 1965, the case was tried to the court without the intervention of a jury, at which time defendants introduced ore tenus and documentary evidence. The plaintiffs introduced no testimony and rely upon the exhibits and record. At the conclusion of the trial the case was submitted and taken under advisement with leave granted to the parties to submit briefs in support of their respective contentions, which have been received and considered by the court. The case is now ready for disposition upon the pleadings, interrogatories and the answers thereto, stipulation, and the evidence adduced at the trial.

The issues as the court views the record are: (a) whether or not the April 2, 1904, deed which contained a grant of "all and singular coal, fire clay and other minerals" granted any interest in oil and gas; (b) the validity of the provision to "elect to take" the surface at a purchase price to be agreed upon by the parties and binding upon their assigns and successors; and (c) whether the words "minerals" or "other minerals" as used in Sebastian County in 1904 in the legal and commercial usage of that community included oil and gas.

## CREATION OF THE MINERAL ESTATE

At one time some distinction seems to have existed between the creation of a mineral estate by reservation and by exception. This distinction does not seem to be of any consequence in Arkansas today. In 66 A.L.R.2d, Minerals—Legal Estate or License, Sec. 5, at page 988, it is stated:

"The technical distinction between a reservation and an exception, under which a reservation was regarded as creating a new interest in the property, passing back from the grantee to the grantor as an incident of the grant, while an exception was regarded as merely part of the limiting description of the thing granted, so that its subject never passed from the grantor, has frequently been referred to in connection with the

question whether a reservation or exception of a mineral right or interest left the grantor with a separate and independent fee estate in the minerals or with only some lesser right or privilege of separating and removing the minerals from the land. However, most of the cases have given little weight to this distinction, holding that the intention of the grantor, rather than the technical words used, controlled, and under such reasoning it has frequently been found that the grantor retained an independent mineral estate in fee." (Citing Bodcaw Lumber Co. v. Goode, (1923) 160 Ark. 48, 254 S.W. 345, 29 A.L.R. 578.)

In Dierks Lbr. & Coal Co. v. Meyer, (W.D.Ark.1949) 85 F.Supp. 157, the court recognized the existence of a division of the mineral and surface estates in fee simple and made the following statement at page 164:

"Since the decision of the Supreme Court of Arkansas in Bodcaw Lumber Company v. Goode, supra, it has been the undisputed law of this State that a grantor may retain an estate in fee simple in the minerals, and by a conveyance with an appropriate reservation effectively create separate titles in the surface and mineral rights."

In Bodcaw Lumber Company v. Goode, supra, the Supreme Court of Arkansas, in recognizing the existence of the possibility of a mineral estate in fee, severed from the surface, stated, 160 Ark. at page 59, 254 S.W. at page 348:

"We are of the opinion that the great weight of authority supports the view that mineral rights are subject to separation from the surface rights so as to be the subject of separate sale. What, we think, is the prevailing rule is stated in 18 R.C.L. p. 1175, as follows:

"'The severance of a mine and the surface of lands may be accomplished by a conveyance of the mines and minerals, or by a conveyance of the land with a reservation or exception as to the mines and minerals. There is no substantial difference between these two methods in the result accomplished; for a reservation will be construed as an exception where that is the plain intent and the grantor will retain himself a fee-simple estate in the portion served. And so the fact that subsequent to the severance of the minerals from the surface estate a conveyance of the land is made in which no reservations or exceptions of the minerals are set forth does not extinguish the rights of the mineral owner nor vest any of the mineral rights in the grantee of such a conveyance. Either a grant or exception of "minerals" will include all inorganic substances which can be taken from the land, and to restrict the meaning of the term, there must be qualifying words or language evincing that the parties contemplated something less general than all substances legally cognizable as minerals.'

"Another text-writer on this subject (Thornton on the Law of Oil and Gas, vol. 1, § 342 states the rule as follows:

"'A reservation or exception of all the mineral in a tract conveyed is a separation of the estate in the mineral from the estate in the surface. "A reservation of minerals and mining rights is construed as is an actual grant thereof." "A reservation of mineral and mining rights from a grant of the estate, followed by a grant to another of all that which was first reserved, vests in the second grantee an estate as broad as if the entire estate had first been granted to him with a reservation of the surface." Of course, what is true of a reservation is also true of an exception. In case of either a reservation or an excep-

tion, the grantor has a right to enter on the surface with all the usual necessary appliances, to remove the mineral, without any express authority reserved to that effect. In case of a reservation of minerals, such mineral descends to the grantor's heirs.'"

The law of Arkansas is thus well settled that the mineral and surface estates can be divided and the minerals held in fee simple absolute by either conveyance through a mineral deed or the reservation or exception by the grantor in a conveyance of the surface estate. The deed in the instant case, a copy of which is attached to the stipulation of facts, conveyed the mineral estate in fee simple to Western by virtue of paragraph 1, as follows:

"We, Franklin Bache and Nannie T. Bache * * * consideration * * do * * * grant, bargain, sell and convey unto the said Western Coal and Mining Company * * * successors and assigns * * * all * * * the coal, fire clay, and other minerals contained within and underlying the following described real estate * * *."

## ADVERSE POSSESSION AND NONUSER AS APPLIED TO MINERAL ESTATES

Although in theory it would seem that the doctrine of adverse possession would apply to mineral estates as well as any other estate, the following Arkansas cases on the point uniformly state that there is no possibility of the loss of the mineral estate when separated in title from the surface by virtue of mere adverse possession of the surface, or non-user.

As stated in Bodcaw Lumber Co. v. Goode, at page 61 of 160 Ark., at page 349 of 254 S.W.:

"It necessarily follows from the adoption of this view, that the separate title to the minerals is retained in perpetuity and that the statute of limitations does not run against these rights unless there is an actual adverse holding which constitutes an invasion of these particular rights. Such is the unanimous view in all the authorities which hold that there is a right of separation and separate conveyance. This subject is thoroughly discussed in the Tennessee cases cited above, also in the case of Scott v. Laws, supra, and in that case note in 13 A.L.R., and there is little left to be said on the subject. The rule of those authorities is that the title to minerals beneath the surface is not lost by nonuser nor by adverse occupancy of the owner of the surface under the same claim of title, and that the statute can only be set in motion by an adverse use of the mineral rights, persisted in and continued for the statutory period."

In Skelly Oil Co. v. Johnson, (1946) 209 Ark. 1107, 194 S.W.2d 425, at page 1119 of 209 Ark., at page 431 of 194 S.W.2d the court said:

"In stating that the junior title claimants would have lost their interest to Mower on November 2, 1934, we are not giving any weight to the holdings of the Louisiana Supreme Court to the effect that a mineral estate is a mere servitude to the surface estate, and may be lost by non-user. Such a Louisiana case is Frost-Johnson Lumber Co. v. Sallings, 150 La. 756, 91 So. 207. Our holdings are entirely contrary to the Louisiana holdings on this point. As stated by Chief Justice McCulloch in Bodcaw Lumber Co. v. Goode, 160 Ark. 48, 254 S.W. 345, 29 A.L.R. 578, we hold that a mineral estate is not a mere servitude, but is a separate estate and may exist in perpetuity and 'is not lost by nonuser nor by adverse occupancy of the owner of the surface under the same claim of title, and that the statute can only be set in motion by an adverse use of the mineral rights, persisted in and continued for the statutory period.'"

See, also, 35 A.L.R.2d, at page 154:

"It has been held or recognized in a large number of cases that after title to the surface estate of land has been severed from title to the underlying mineral estate, title to the minerals cannot be acquired by adverse possession of the surface alone."

Citing Arkansas:

Bodcaw Lumber Co. v. Goode, (1923) 160 Ark. 48, 254, S.W. 345; 29 A.L.R. 578; Grayson-McLeod Lumber Co. v. Duke, (1923) 160 Ark. 76, 254 S.W. 350; Claybrooke v. Barnes, (1929) 180 Ark. 678, 22 S.W.2d 390; 67 A.L.R. 1436; Skelly Oil Co. v. Johnson, (1946) 209 Ark. 1107, 194 S.W.2d 425; Buckner v. Wright, (1951) 218 Ark. 448, 236 S.W.2d 720; Dierks Lumber & Coal Co. v. Meyer, (1949 D.C.Ark.) 85 F.Supp. 157. See, also, Jones v. Brown, (1947) 211 Ark. 164, 199 S.W.2d 973.

The ALR Arkansas citations quoted above do establish, however, that the mineral estate, after being severed from the surface, could be acquired by adverse possession of the mineral estate by the removal of the minerals. However, possession of the surface is not sufficient to establish an adverse possession claim to a severed mineral estate.

The plaintiffs rely upon an alleged abandonment by Western of its interest in the minerals by failure to mine or develop. There is some authority for the principle that failure to enter the surface at a reasonable time to exercise the rights in an estate severed from the surface may be lost by lapse of time, but it has not been applied to severed mineral estates. See, Liston v. Chapman & Dewey Land Co., (1905) 77 Ark. 116, 91 S.W. 27, in which the Supreme Court of Arkansas held that the failure of the grantee to remove standing timber under a timber deed within a reasonable time constituted a forfeiture of the right to enter. At page 119 of 77 Ark., at page 28 of 91 S.W. the court stated:

"The implication of reasonable time only, being granted to the grantee where no time is specified, is a construction placed upon such deeds for the benefit of the grantor and his successors in title, and they may waive the forfeiture of the right to enter on the part of the grantee, and may by writing or parol extend the time for the cutting and removal before or after the reasonable time has expired.

"What is a reasonable time is generally a mixed question of law and fact. The facts are to be ascertained by an inquiry into the conditions of the land and timber, the obstacles opposing, and the facilities favoring, and the conditions surrounding the parties at the time the contract was made. When all the circumstances are considered, and the facts are determined, the law will declare whether reasonable time has expired for cutting and removing the timber conveyed. Carson v. [Three States] Lumber Co. [108 Tenn. 681, 69 S.W. 320], supra. No fixed rules can be established for ascertaining what is a reasonable time. The facts and circumstances of each particular case must determine this."

In the Bodcaw Lumber Company case, the Liston v. Chapman & Dewey Land Company case, quoted above, is referred to, and the following statement is made with respect to the mineral grantee's nonuser of its interest at page 61 of 160 Ark., at page 349 of 254 S.W.:

"As presenting an analogous question, our attention is called to the case of Liston v. Chapman & Dewey Land Co., 77 Ark. 116, 91 S.W. 27, where we held that a deed to standing timber which specifies no time for removal 'conveys to the grantee an estate in the timber which runs with the land, and goes on forever, but that the right to enter upon the land for removing the timber exists

for only a reasonable time after the execution of the deed, and that, if the grantee thereafter enters upon the land to remove his own timber, he will be guilty of trespass.' It is insisted that in order to be consistent, we should follow that rule with respect to minerals. We think, however, there is a broad distinction between a sale of timber and mineral rights, for the use of the former necessarily creates a burden upon the owner of the surface, which is not consistent with use by the latter, whereas the use of the surface for mining purposes is only incidental and does not necessarily impair, to a serious extent the enjoyment of the surface rights. In the Liston Case, supra, we expressly recognized the anomaly and apparent contradictions in that phase of the law with reference to the absolute title to the timber and yet the requirements that the right thereunder must be exhausted within a reasonable time, but we have no hesitancy in saying that the reason for that rule as applied to the removal of timber has no application to the enjoyment of mineral rights where there is no interference with the enjoyment of surface rights during the period of delay. Since there was an independent and separate right to the minerals, no lapse of time would impair the continuance of the right or bar its enjoyment on account of laches."

## RULE AGAINST PERPETUITIES

In the deed executed by Franklin Bache and wife to Western, quoted above in Footnote 1, there is contained the following provision with respect to the acquisition of the surface:

"Provided, that so much of the surface of said grounds as the Western Coal and Mining Company, its successors or assigns, may at any time elect to take under the provisions of this deed it shall pay to the said Franklin Bache, his heirs, ex-

ecutors, administrators or assigns, an amount of money to be agreed on between the parties hereto."

Thereafter the deed contains a provision setting out the manner in which the purchase price of the surface taken is to be determined. It should be noted, however, that "using" the surface is conditioned upon Western's electing to take the desired surface area in fee and paying the purchase price.

The rule against perpetuities as applied and used in Arkansas is stated in Hendriksen v. Cubage, Trustee, 225 Ark. 1049, 288 S.W.2d 608 (1956), at page 1055 of 225 Ark., at page 612 of 288 S.W.2d as follows:

"The general rule is very well stated in 41 Am.Jur. at page 50 under the heading 'Rule Against Perpetuities', which, in part, reads:

" 'Although all the established forms have been complied with governing the alienation of property, the law, for reasons of public policy, still imposes some restrictions on the right to dispose of property. One of the most important of these restraints is the rule against perpetuities. The rule against perpetuities prohibits the creation of future interests or estates which by possibility may not become vested within the life or lives in being at the time of the testator's death or the effective date of the instrument creating the future interest, and twenty-one years thereafter' etc."

The rule against perpetuities, of course, is no more than a prohibition against the attempted creation of estates in fee which depend for their vesting upon a contingency to take place sometime in the future without limitation. A contingency which is capable of vesting the interest in fee simple in lives in being plus 21 years does not violate the rule against perpetuities. An interest in the surface in fee in the nature of an option or an election which grants a contingent interest, the exercise of which depends upon the discretion of the gran-

tee and its successors or assigns and without any limitation as to time, unduly encumbers the alienation of the estate and constitutes a cloud upon the title.

■ The rule against perpetuities, as applied to options to purchase real property, is well but briefly stated in 162 A.L.R., Annotation, beginning at page 581, as follows:

"According to the weight of authority in jurisdictions applying the common-law rule against perpetuities, an option to purchase real property, unlimited as to the time for its exercise or extending beyond the period limited by the rule against perpetuities, violates such rule and is invalid."

The plaintiffs in their brief cite and rely upon Barton v. Thaw, 246 Pa. 348, 92 A. 312, (1914), in which the court, in analyzing the interest created in an option to purchase the surface in fee, made the following statement with respect to the rule against perpetuities:

"The case turns very largely upon the character of the interest in the surface which the optionees took under the covenant. If it was a present, fixed, and vested interest in the land, the rule against perpetuities would have no application. But is a mere option to purchase land, unlimited as to time and indefinite in duration, which may be exercised in 10 years, or in 100 years, or in 1,000 years, or which may never be exercised at all, depending upon the wish and pleasure of the optionee, a present vested interest? To ask this question would seem to answer it. In no proper legal sense can a mere privilege of exercising a future right to purchase be deemed a present vested interest in land. The optionees may never exercise their option, and, failing to do so, they would never acquire a vested interest in the land."

The above quoted portion seems particularly applicable in the instant controversy as Western, by virtue of the elec-

tion provision of the Bache deed, was granted an option to purchase the surface in fee which was unlimited in time and of indefinite duration. The defendants contend that this election to take the surface does not constitute a cloud upon the plaintiffs' title as it granted Western no more right in the surface than it impliedly received by virtue of its grant of the mineral estate in fee. The plaintiffs, however, contend that the election to take the surface for a price to be agreed upon in the future is in effect a grant of an interest in the surface in fee, contingent upon the defendants in their discretion exercising it at some time subsequent to April 2, 1904. The provision with respect to taking the surface does on its face reflect an attempt to create in Western and its assigns or successors the power to succeed to the surface in fee. This provision creates a future estate in the sense that Western and its assigns or successors may become the absolute owner in fee of the surface by the exercise of the election granted. The vesting of the estate in fee simple depends, of course, upon the exercising of the election. The vesting is therefore contingent upon the grantees' making an election in the future. This interest in the surface is thus capable of becoming an ownership in fee simple, and is therefore an attempt to create a future interest, the vesting of which is contingent with no time limitation upon the contingency.

■ To sustain this option would give the grantee, Western, its assigns and successors, an election to acquire the surface in fee simple without any limitation as to time, and would thus violate the rule against perpetuities. The underlying purpose of the rule against perpetuities is to prevent such restrictions upon the alienability of property which has the effect of indefinitely encumbering it.

## OIL AND GAS

■ It is equally well settled in Arkansas that a separate estate in oil and gas can be created by grant or reserva-

tion or exception in fee, life estate or term of years. O'Neal v. Bank of Parkdale, 180 Ark. 901, 23 S.W.2d 257 (1930); Osborn v. Ark. Territorial Oil & Gas Co., 103 Ark. 175, 146 S.W. 122 (1912); Belleville Land & Lumber Co. v. Griffith, 177 Ark. 170, 6 S.W.2d 36 (1928); Missouri Pac. R. Co. v. Strohacker Co., 202 Ark. 645, 152 S.W.2d 557 (1941).

In Missouri Pac. R. Co. v. Strohacker, supra, the Supreme Court of Arkansas, although recognizing that a reservation of minerals may include oil and gas, held that a deed executed in 1892 reserving "all coal and minerals deposited in and upon said lands" did not include oil and gas in Miller County, Arkansas, as not being within the intention of the parties for the reason that oil and gas were not included in the common usage of the word "minerals" generally in the community in Miller County, Arkansas, in 1892.

In Missouri Pac. R. Co. v. Furqueron, 210 Ark. 460, 196 S.W.2d 588 (1946), the court stated that the use of the term "minerals" did not include oil and gas in Miller County in 1892. Both decisions emphasize that whether or not the term "minerals" includes oil and gas is a question of fact based upon the legal and commercial usage of the term in the community where the particular conveyance was executed.

Carson v. Missouri Pacific R. Co., Thompson, Trustee, 212 Ark. 963, 209 S.W.2d 97 (1948), the deed in question was executed in 1892 and contained the following reservation: "all coal and mineral deposits." The Supreme Court held that bauxite was not included, relying upon Missouri Pac. R. v. Strohacker and Missouri Pac. R. v. Furqueron. The court in an opinion by Justice Robins very carefully pointed out that bauxite was not known to be in existence in Arkansas in 1892, and asserted that commercial use of bauxite was of comparative recent origin. The deed in question related to 40 acres in Saline County, and the court pointed out that the reservation could not have included bauxite since bauxite was antedated by the exploration and use of petroleum, which the

court had held was not included in the term "minerals" in the same year in Miller County in the Strohacker case.

In Stegall v. Bugh, 228 Ark. 632, 310 S.W.2d 251 (1958), the court had for consideration a deed executed in 1900 conveying 120 acres in Union County, Arkansas. The deed contained the following exception: "except the mineral interest in said lands." The trial court held that the words did not include oil and gas, and the Supreme Court affirmed. At page 633 of 228 Ark., at page 253 of 310 S.W.2d the court stated:

"Based on the above testimony showing the intention of B. H. Stegall to reserve oil and gas rights at the time he executed the deed in 1900, appellant relies on language used by this court in the case of Brizzolara v. Powell, 214 Ark. 870, 218 S.W.2d 728, 730, for a reversal. In considering a similar exception in the cited case, we said that, 'the question involves the intent with which these words were used', etc. From the quoted language and other similar language found in the cited case, appellant appears to conclude that the 'intent' of the grantor is controlling here. Expressed another way, appellant's argument appears to be that, based on the Brizzolara case, supra, it is our duty to determine from the testimony just what B. H. Stegall had in mind when he used the word 'mineral' in the exception in the conveyance to Goodwin. We do not agree that this is a correct interpretation of the holding in the Brizzolara case, supra, or of the holdings in similar decisions to which that case makes reference and which we will mention presently. *We think that the meaning which this court has heretofore and should hereafter give to the word 'mineral', in connection with its use in situations similar to those of this case, is governed not by what the grantor meant or might have meant, but by the general legal or commercial usage of the word at the time*

*and place of its usage.* The testimony in the case under consideration justified the trial court, we think, in finding that the word 'mineral', in its accepted legal and commercial usage, did not include oil and gas in Union County in 1900. This testimony was to the effect that there was no oil production in Union County until about 20 years after the deed in question was executed and that the word 'minerals', as commonly used in Southern Arkansas and in Union County in 1900 would not have included oil and gas. A geologist with the Arkansas Oil & Gas Commission for about 6 years stated that the first showing of oil in Union County was in 1920; that in 1900 there was no oil produced in East Texas, or Northern Louisiana; that the understanding of the people engaged in the oil business in 1900 and until 1919 was that there would never be any production in the southern part of Arkansas, and; that the word 'minerals', from the standpoint of the oil industry in Union County during the above mentioned period would not have included oil and gas." (Emphasis added.)

The Supreme Court in the Stegall opinion reviewed Strohacker, Furqueron, and Carson cases, respectively, as well as Brizzolara v. Powell, 214 Ark. 870, 218 S.W.2d 728 (1948). The court in the concluding paragraph of its opinion found as a fact that the deed executed in 1900, which was eight years after the deed in the Strohacker and three years after the deed in the Brizzolara cases, did not by the use of the word "minerals" include oil and gas. From the above quoted portion of the Stegall opinion the court is very careful to point out that whether or not the term "minerals" or "all other minerals" includes oil and gas is a question of fact to be governed by "the general legal or commercial usage of the word at the time and place of its usage." Justice McFaddin, in his dissent, beginning at page 636 of 228 Ark., at page 254 of 310 S.W.2d of Stegall, in

reviewing the prior Arkansas Supreme Court cases dealing with the reservation or grant of "minerals," asserted that the court should establish some specific date when the term "minerals" included oil or petroleum. He selects January 1, 1900, and at page 640, at page 256 of 310 S.W.2d makes the following statement:

" * * * I think it is important that we set a date; and I think the date should be set at January 1, 1900. This case shows to me that when the deed here involved was executed in November, 1900, (a) that the man executing the deed understood it reserved minerals; (b) that the oil fraternity operating in nearby sections understood that oil was a mineral; and (c) that the Encyclopedia Britannica listed petroleum as a mineral. The time has come when we should do away with uncertainty in this matter; and I think January 1, 1900 is the date to fix."

The dissent does recognize that the majority considers the question of the inclusion of oil and gas in the use of the term "minerals" to be one of fact to be determined upon a place and time basis. It is interesting to note that Justice McFaddin made the following statement with respect to the development of the oil industry in Arkansas and specifically to Sebastian County at page 637, at page 255 of 310 S.W.2d, as follows:

"(b) The next point is that prior to 1900 the oil fraternity generally understood that oil (i. e. petroleum) was a mineral. The record here before us shows that as early as 1887 and 1888 there were reported traces of oil in wells drilled in Sebastian County, Arkansas; that oil had been discovered in Louisiana before 1900; and that gas had been discovered in East Texas as early as 1868. The record shows that in 1895 and 1896 oil had been developed in commercial quantities in the fields in Corsicana, Texas. If people in Sebastian County, Arkansas, and in North Louisiana and in Corsicana, Texas, con-

sidered oil as a mineral in the years mentioned, why should the oil fraternity of Union County, Arkansas, be considered to be less intelligent?

"(c) Then, there is the matter of general information. Publication of the Ninth Edition of the Encyclopedia Britannica was completed in 1889; and in Vol. 18 of that edition, beginning on page 72, there is an article of several pages on the subject of petroleum, which is called 'rock oil'. Likewise, in the same Ninth Edition of the Encyclopedia Britannica (publication completed in 1889) there is in Vol. 16 at pages 346 to 431, an exhaustive article on the subject of 'Mineralogy', which is the study of minerals. It is there stated on page 346: 'Mineral bodies occur in the three physical conditions of solid, liquid, and gas'. Then on page 430 of the same volume—in the index of minerals—petroleum is listed as Mineral No. 707; and on page 428, in discussing 'petroleum', it is again listed as a mineral. Let it be remembered that it was in 1889 that the Ninth Edition of the Encyclopedia Britannica completed its publication; and copies of this edition have been in Arkansas since before 1900. So, I make the point that by January 1, 1900 petroleum was considered as a mineral by general information; and we should now so declare."

In Mothner v. Ozark Real Estate Co., (8 Cir. 1962) 300 F.2d 617, the Court of Appeals affirmed the trial court's finding that the use of the word "mineral" did not include oil and gas in a conveyance of property in Johnson County, Arkansas, in 1891. The court was careful to point out that whether or not oil and gas is included in the term "mineral" is one of fact, citing Stegall v. Bugh, supra; Missouri Pac. R. v. Strohacker, supra; Missouri Pac. R. v. Furqueron, supra; Carson v. Missouri Pac. R., supra; Brizzolara v. Powell, supra.

In Dierks Lumber & Coal Co. v. Meyer, (W.D.Ark.1949) 85 F.Supp. 157, the court held that a reservation of one-half interest of minerals in a grant of property in Garland County, Arkansas, in 1940 included novaculite. The court found as fact "that novaculite was commonly known and recognized for its commercial value in the vicinity; that the grantors of the deed * * * had actual knowledge of the existence of the substance upon the land in question."

In Singleton v. Missouri Pac. R. Co., (E.D.Ark.1962) 205 F.Supp. 113, the District Court held that a reservation in a deed of "all the minerals" included oil and gas underlying a 40-acre tract in Pope County, Arkansas, in 1934. The District Court made the following statement with respect to the term "minerals" as it was used in the business community in Pope County, Arkansas, in 1934, at page 118:

"It is a well known fact that when oil and gas activity, including the leasing of lands for the purpose of drilling for oil and gas, becomes common in a given area, the people in that area soon incorporate oil and gas into their concept of 'minerals,' and the term 'minerals' comes to be understood in common speech as including oil and gas. In view of the oil and gas activity which was going on in the general area in question prior to 1934, the Court finds that in 1934 the term 'minerals,' in common speech and usage in that area, had come to include oil and gas, and to the extent that plaintiff's evidence is to the contrary it cannot be accepted by the Court. It follows from this finding that oil and gas were included in the reservation appearing in the deed to plaintiff's predecessor."

In 1A Summers Oil and Gas, Sec. 135, at page 278:

"In accordance with the rule that intention controls, it has been held in several cases that oil and gas were not included in grants or reservations of minerals, when from the language of the instrument, or from the facts and circumstances sur-

422

rounding the parties at the time of its execution, it was apparent that they did not have oil and gas in mind." (Citing Missouri Pac. v. Strohacker; Missouri Pac. v. Furqueron; Brizzolara v. Powell.)

The author of the text in the section from where the above quoted material is taken was careful to point out that whether or not oil and gas are included in the term "minerals" depends upon the particular time and place of the execution of the instrument being construed.

Although Missouri Pac. R. Co. v. Strohacker is often cited for the proposition that "coal and mineral deposits" did not include oil and gas in the year 1892 in Arkansas, it does not establish as a matter of law that the term "minerals" does not include oil and gas in every deed executed in Arkansas in 1892 or prior thereto. The Supreme Court cases which have construed and applied Strohacker subsequently are unanimous in their holding that whether or not any particular instrument using the term "minerals" or "all minerals" included oil and gas is a question of fact. It is, of course, settled as a matter of law that the term "minerals" did not include oil and gas in 1892 or prior thereto in Miller County, Arkansas, by the Strohacker decision. As stated in the Supreme Court's review in Stegall v. Bugh, supra, this question of fact must be determined on a county-by-county basis, taking into consideration the time and place of execution of the instrument under examination. It would thus seem that it is an open question as to when the term "minerals" included oil and gas in all other counties except Miller, Union and Pope Counties. An examination of the dissent of Justice McFaddin in the above quoted portion from the Stegall case reveals that oil and gas were in existence and of interest to the business community of Sebastian County prior to 1900.

There was in fact existing and operating gas wells in Sebastian County in 1900. See Osborn v. Arkansas Territorial Oil and Gas Co., 103 Ark. 175, 146 S.W. 122 (1912), in which an oil and gas lease was construed by the Supreme Court covering 80 acres situate in Sebastian County. The lease was executed and recorded April 5, 1906. The Supreme Court at page 179, at page 124 of 146 S.W. made the following statement with respect to its recognition of gas as a mineral:

"It has been said that natural gas is a fluid mineral substance, subterraneous in its origin, possessing in a restricted degree some of the properties of underground waters, and resembling water in some of its habits. It is found in the land, but has the power to escape without the volition of the owner of the land. It has, however, been well settled, we think, that natural gas is a mineral, and while in place in any particular land it is part of the land itself. Until severed from the realty, it is as much a part of it as coal or stone, and, so long as it remains under the ground, it is treated as a part of the realty itself under the surface of which it lies. It therefore belongs to the owner of the land in which it is found, and, as long as it remains in the particular tract of land, the owner of the surface is the owner of the gas beneath it. It has been uniformly held that conveyances of gas in its natural state in the land require all the formalities of a conveyance of any other interest in the same real estate, and that the ownership of the gas passes to the grantee of the land itself in event the right to the same is not expressly reserved in the deed conveying the land. Thornton on Law Relating to Oil & Gas, §§ 20, 230; Donohue on Petroleum & Gas, p. 9; 16 Amer. & Eng. Enc. Law, 220; Funk v. Haldeman, 53 Pa. 229; Westmoreland Natural Gas Co. v. De Witt, 130 Pa. St. 235, 18 Atl. 724, 5 L.R.A. 731; Wilson v. Youst, 43 W.Va. 826, 28 S.E. 781, 39 L.R.A. 292."

It cannot be doubted that the gas industry was sufficiently developed in the area of Sebastian County in 1906 to be

of common knowledge in the community. With existing gas wells in operation, it cannot be doubted that the business community considered gas as a valuable mineral. The question thus resolves itself in the instant controversy as to whether or not the use of the words "other minerals" in a deed executed in 1904 included oil and gas in Sebastian County, Arkansas.

The record contains numerous oil and gas leases executed prior to the execution of the deed under consideration. An examination of the abstracts and summaries of these leases, which are Exhibits 27A, 27B, 27C, 28, 28A, 29 and 30, reflects that the parties, in expressing their intention to grant any interest in oil and gas, used the specific terms. For example, Exhibit 28 is an abstract of a deed recorded in Book S, page 274, filed December 15, 1887, in the records of the Fort Smith District of Sebastian County, Arkansas, and is a mineral lease of W. H. Rogers to the Fort Smith Natural Gas & Power Company. The mineral granting clause states: "does hereby bargain, sell and convey unto the said second party all the Stone, Coal, Oil, Gas, Salt Water and other minerals or volatile substances that may underlie the following described tract." Exhibit 27 is a mineral lease by S. A. Hodges to Choctaw Oil Company recorded in Book 26 at page 507 in the records of the Greenwood District of Sebastian County, filed May 1901, which grants to the Choctaw Oil Company "the exclusive right to prospect, bore and mine for lead, zinc, iron, coal, gas, oil and other minerals on said land." Exhibit 28A is an abstract of a mineral lease of Messrs. Bocquin and Reutzel to the Fort Smith Natural Gas & Power Company, recorded in Deed Book U, page 465, of the records of the Fort Smith District of Sebastian County, Arkansas, filed January 3, 1888. The granting clause uses the following language in the mineral conveyance: "the exclusive right to test, open, mine and remove said coal, oil, gas, salt water or other mineral or volatile substances, and further grants the right to construct railroads, underground entries, and all necessary buildings and fixtures to facilitate the mining and removing of said coal, oil, gas, salt water and other minerals or volatile substance."

Exhibits 30 and 31 are mineral leases executed in 1906 which is, of course, subsequent to the execution of the deed in question. The granting clauses, as abstracted in these exhibits, also specifically use the words "oil and gas." The summaries heretofore referred to, as well as the granting clauses in the instruments set out above, affirmatively establish that the parties to instruments creating or granting an interest in oil and gas in this area at the time the instant deed was executed did not express an intention to convey oil and gas by the mere use of the terms "minerals" or "other minerals," but specifically used the term "oil and gas" where there was an intention to grant an interest in these minerals.

▆▆▆▆ The deeds executed by the Missouri Pacific Railroad and its predecessor in title, St. Louis, Iron Mountain and Southern Railway Company, which were considered in the Strohacker and Furqueron cases were held not to include oil and gas upon the particular facts by the use of the term "minerals" and the absence of any specific reference to oil and gas. The business community in this period in Sebastian County, although apprised of the existence and the commercial usage of gas, did not by their usage of the word "minerals" in a conveyance consider that term to include oil and gas. The failure of the parties to specifically refer to oil and gas when it was of commercial value in the community is strong evidence that such interest was not intended to pass under the instant deed. Notwithstanding the advanced state of development of this industry in Sebastian County[2] in 1900

---

2. The record also contains abstracts of numerous newspaper articles. An abstraction of an article in the Arkansas Gazette of November 25, 1888, states: "The People of Fort Smith Discover Natural Gas at Last." It then relates

through 1906, the court is of the opinion that the term "minerals" or "other minerals," as commonly used in the legal and business community in April 1904, did not include oil and gas. As applied to these particular parties, the grantee had no apparent interest in any possible oil and gas as a mineral as it had at that time shown no interest in the development of this particular industry. Its business was the development and production of coal reserves. Had it sought the possible oil and gas estate, it would have specifically provided for it as it did with respect to the coal and fire clay. The subjective intent of the parties, however, as heretofore stated, is not the governing criteria in determining what is included by the use of the term "minerals" or "other minerals." The exhibits, heretofore referred to, as well as the existence and the operation of producing gas wells in Sebastian County in 1904 convince the court that, although the business community regarded oil and gas a valuable mineral, the common and commercial usage of the terms "minerals" or "other minerals" in Sebastian County during this period did not include oil and gas.[3]

For the reasons above stated and in clarification thereof the court makes the following summary and conclusions of law:

1. The deed from Franklin Bache and Nannie T. Bache, his wife, of April 2, 1904, granted to Western Coal and Mining Company all fire clay and coal in fee simple absolute.

2. The provision in the 1904 Bache deed which granted an election to Western Coal and Mining Company, its successors or assigns, to "at any time to elect to take under the provisions of this deed" the surface in fee and pay an amount to be agreed upon as the purchase price is null and void.

3. The Missouri Pacific Railroad Company has abandoned all rights in the surface to its railroad right-of-way as provided in the stipulation between the parties.

4. Natural gas was of commercial value and in production in Sebastian County on April 2, 1904.

5. Although natural gas was of commercial value and in production in Sebastian County in 1904, the terms "minerals" and "other minerals" did not in

---

the discovery on November 24, 1888, of a gas well within four miles of the city limits of Fort Smith. (Ex. 6) An article in the Fort Smith Elevator, Friday, November 30, 1888, reflects that a natural gas well was operating on a farm at Massard, and concludes with the statement that "Fort Smith today would not swap places with Kansas City or New York. Natural gas did it." (Ex. 8) An article of the Fayetteville Democrat, November 30, 1888, entitled "The People of Ft. Smith Discover Natural Gas at Last," states: "Ft. Smith, Ark., Nov. 24.—This city is wild to-night over the discovery of natural gas four miles from here by the Natural Gas and Oil Company, who have been operating here for more than a year." (Ex. 7) A quotation from the 8th Biennial Report of the Bureau of Mines, Transportation and Agriculture, of the State of Arkansas for 1903 and 1904, an official report of the State, Exhibit 9, in referring to Mansfield, Arkansas, states: "the town is lighted by natural gas." The Fort Smith City Director of 1904, published

by Southern Directory Co., as quoted in Exhibit 10, states: "Natural gas is being piped into our city from wells 6 to 30 miles south, and a coal oil refinery is being considered, to pipe oil from nearby wells." Various other exhibits which contain excerpts from almanacs, official state reports, and histories of Arkansas, reflect actual production in commercial quantities of gas in Sebastian County, Arkansas, in 1900 and prior thereto.

3. The plaintiffs also rely upon the doctrine of ejusdem generis in support of their contention that the intention of the parties as expressed in the deed did not include oil and gas. In view of the court's determination of the meaning of the terms "minerals" and "other minerals" no attempt will be made here to apply it to the language used in the instant deed. An examination of Arkansas cases involving the ejusdem generis doctrine in construing instruments does disclose that it has not met with much favor in the appellate courts.

the legal and commercial use of that community include oil and gas in Sebastian County on April 2, 1904.

An order should be entered in accordance with the above and with directions to the plaintiffs to submit precedent for final judgment.