# COMMONWEALTH REALTY CORPORATION
## ET AL. *v.* BOWERS ET AL.

[No. 355, September Term, 1970.]

*Decided March 9, 1971.*

*Motion for rehearing filed April 1, 1971; denied April 8, 1971.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*Harris James George,* with whom was *Kenneth J. Mackley* on the brief, for appellants.

*John H. Urner* and *Daniel W. Moylan,* with whom were *Byron, Moylan & Urner* on the brief, for Sun Oil Company, part of appellees. No brief filed on behalf of other appellees.

BARNES, J., delivered the opinion of the Court.

The principal question in this appeal concerns the validity of an option dated October 13, 1965, between Commonwealth Realty Company, one of the plaintiffs below and one of the appellants in this Court (Commonwealth), as "Buyer" and Garman L. Bowers and Wahneta Bowers, his wife, two of the defendants below and two of the appellees in this Court, as "Seller" whereby Commonwealth for a consideration of $100.00 was given the "privilege of purchasing" from the Bowers for $18,000.00 a parcel of land located along the Sharpsburg Pike in Washington County.

Chief Judge McLaughlin in a specific performance suit filed by Commonwealth in the Circuit Court for Washington County on October 29, 1968 (Commonwealth Realty Corporation, the parent Company of Commonwealth being joined as a party plaintiff as the real party in interest in accordance with Maryland Rule 203 a, and the other appellant in this Court), against Mr. and Mrs. Bowers and the Sun Oil Company (Sun) (the remaining defendant below and appellee in this Court) to enforce specifically the contract of October 13, 1965, or, in the alternative, for damages, and for other relief, dismissed the bill of complaint on July 29, 1970, upon a number of grounds including laches, abandonment of the contract

by Commonwealth and vagueness in the contractual language. We are of the opinion that the provision of the option contract relied upon by Commonwealth is void and unenforceable as violating the rule against perpetuities, and, in any event, even upon the construction urged upon us by Commonwealth, would be an unreasonable restraint on alienation. We will affirm the decree for these reasons, finding it unnecessary to rule upon the additional reasons assigned by the Chancellor for dismissing the bill of complaint.

The option contract (which was a printed form amended as indicated below), which bound and inured to the heirs, personal representatives and assigns of the respective parties, after reciting in paragraph 1 the $100.-00 consideration and the ultimate purchase price of $18,-000.00, provided in relevant part, as follows:

> "2. This Agreement shall extend for 180 days; or, if the requisite zoning and permits, described in Article 4 hereof have not been finally issued or denied beyond appeal, until 15 days after such final action thereon. Buyer may renew it for an additional period of 180 days from the later of the above dates by paying as consideration therefor, monthly in advance, the sum of $2.00 for each day so renewed.
> "3. Upon at least 4 months notice from Buyer of election to exercise the privilege herein granted and appointment of time and place of settlement,* Seller shall promptly clear the title of all liens, encumbrances, tenancies, and applicable special assessments due or about to become due, and, thereafter, deliver the premises to Buyer by recordable deed conveying a good and marketable title with the usual covenants of warranty in return for Buyer's certified check for the purchase price hereunder less consideration paid for this agreement. Settlement ex-

*which shall not be prior to July 1, 1966

penses shall be shared according to local custom. Stamps and transfer charges shall be divided equally between the parties. Taxes and public charges shall be prorated to date of settlement.

"4. It is understood that Buyer intends to use the premises for a drive-in business and/or commercial purposes generally; that Seller shall sign all applications necessary to ~~zoning approval and~~ special or usual permits for such use to Buyer's plans; that ~~Seller on request of~~ Buyer shall thereafter process such applications through cognizant governmental departments. If ~~zoning and/or~~ permits are refused, or if title is not in order (as above or because any restrictions therein shall prohibit construction or operation according to Buyer's plans), then this Agreement shall terminate at the option of Buyer and all monies paid hereunder shall be returned. If, however, this Agreement is terminated by Buyer for any other reason there shall be no return of monies paid hereunder.

"5. Notices hereunder shall be given by certified mail to the above addresses.

"6. W. Paul Settles is acknowledged as the procuring broker in this transaction. with brokerage to be paid by buyer."

The agreement is under seal, signed by both Mr. and Mrs. Bowers (but not by Commonwealth on the copy in the record), and is witnessed as to both by "Lee Downey." The following appears at the end of the agreement:

"State of Maryland, County of Washington; Sct:

"Subscribed and sworn this 13th day of October, 1965

"My commission expires 7-1-67        James C. Stevens"

A notarial seal for "James C. Stevens" is affixed on the document.[1]

Commonwealth had obtained on January 25, 1966, a contract of sale on the Smith property which immediately adjoins the Bowers property on the south. In order to obtain a health department permit for a sewerage system for the Smith property (there being no public sewer available), Commonwealth sometime in March, 1966, made application to the Washington County Health Department for a percolation test and permit. First, small test holes were dug, some fifteen by thirty inches, but the Health Department did not find that the use of these holes passed the percolation tests. The Supervisor of the Sanitarians of the Health Department, Frank H. Warfield, then indicated that the Smith property would have to be retested by use of deeper and larger holes dug by a back hoe. Commonwealth then employed a local contractor, James Short, to dig the larger and deeper holes. Mr. Bowers, who could easily see from his property—where he and his wife resided—the digging of the holes by the back hoe on adjacent Smith property, testified, without contradiction, that these holes were approximately four or five feet wide by four or five feet long and about four or five feet deep.

Mr. Warfield, after inspecting the Smith property after the large holes were dug by the back hoe, wrote Commonwealth on March 23, 1966, as follows:

> "In response to your request I visited the premises of the Lee L. Smith property on Maryland Rt. 65 near Interstate Route 70 to evaluate the suitability of the ground for the installation of a private sewage disposal system for the

---

1. The option contract was recorded among the land records of Washington County on April 19, 1966, according to the testimony of one of the witnesses, although the recordation notation does not appear on the copy of the option contract in the record. No challenge is made in regard to the recordation by the appellees, either below or in this Court, and we will assume, without deciding, that the option contract was effectively recorded and gave constructive notice of its contents on and after its recordation.

planned Drive-In service station. Mr. James Short had dug holes in an effort for this department to determine the availability of ground suitable for a private sewage disposal system.

"On March 22, 1966, the visit indicated that due to the degree of rockiness and the limited space for a private sewage disposal system, we cannot issue a permit at this time.

"We would recommend that you engage a professional engineer to design a sewage system for your Drive-In service station based on the regulations of the Maryland State Department of Health.

"Our evaluation of the land indicates that more ground which is suitable for a private sewage disposal system is required."

Commonwealth then requested Lee Downey, of the Settles Real Estate Agency, the real estate broker who had assisted in the obtention of the option contract of October 13, 1965, to obtain permission from the Bowers to allow the same testing on their property as had been done on the Smith Property. Downey went to the Bowers property on March 31, 1966, and talked with Mr. Bowers, this being the first contact the Bowers had had with any one from Commonwealth since October 13, 1965, when the option contract was signed.

Mr. Downey talked with Mr. Bowers and Bowers refused permission to bring a back hoe on the property because, as he testified, the Health Department had told him over the telephone that this was not necessary and Bowers was apprehensive that harm would result to his children and his ponies from the digging of large holes on the property. Bowers did say that he would allow the usual tests which had been described to him by the Health Department.

On April 9, 1966, Carl G. Wittig, another representative of Commonwealth, called on Mr. and Mrs. Bowers to talk to them about their refusal to allow a back hoe

on the property. Mr. Bowers again refused but stated that he would sign the necessary applications for the necessary tests.

Mr. Wittig, on April 11, sent a letter to the Bowers as follows:

> "Your recent refusal to allow us to perform percolation tests on your Sharpsburg Pike property renders it impossible for us to procure permits as contemplated in the Agreement of October 13, 1966[5]. Of course it also extends the period of that Agreement.
>
> "Since you refuse us permission to accomplish such tests, at our expense we will expect you to undertake them at your expense and advise us the results and we will treat such period as elapses between 11 April and full completion of such tests as an extension of the basic 180 day period.
>
> "Herewith you will find our check for $60.00 for the first 30 days of the 180 day extension period. As above, the 30 day portion and the 180 day period will not start upon completion of percolation tests and issuance of Health Department report instead of 11 April 1966."

Counsel for the Bowers on April 12 replied to the Wittig letter of April 11, in relevant part, as follows:

> "Please be advised the option signed by the Bowers made no provision for any entry by optionee upon the land of the Bowers for any purposes. Paragraph #4 of said option required of the Bowers, only to sign any application forms, etc., that optionee requested. No applications were ever presented to the Bowers for signatures. No request to perform percolation tests were made or refused.
>
> "On March 31, when a representative of your company requested permission to enter upon the

property of the Bowers with a backhoe digger to dig holes which were described to them to be of the size of 4 by 5 feet, permission was refused as holes this size are not necessary for percolation tests. When a representative from your company visited them on April 9, he was informed that if he would bring the necessary application from the Health Department for percolation tests, they would sign. No application was presented to them before expiration of this option.

"Am returning your check in the amount of $60 and we consider the option, dated October 13, 1965, as having expired; and, have advised the Bowers that they are now free to deal with the property as they see fit."

Commonwealth, as we have indicated, recorded the option contract of October 13, 1965, on April 19, 1966, and Commonwealth wrote the Bowers on April 27 that it had received the letter from their counsel of April 12, regretted the position taken by them and observed that the advice given them by their counsel "may be correct" but that Commonwealth thought that it was not. The letter of April 27 then continued:

"The Washington County Health Department indicated that deep test holes are a prerequisite to percolation test for commercial usage. As described to you by both Messrs. Downey and Wittig, these test holes would be refilled the same day they were dug. While open, they would have been guarded.

"Accordingly, we reiterate the advice of our letter of April 11, 1966 and advise you that we consider the Agreement of October 13, 1965 to be in continuing force and effect and that we intend to reserve our rights thereunder."

The Health Department, on May 3, advised Common-

wealth that a permit for the Smith property would be issued subject to certain conditions. Commonwealth took title to the Smith property on May 6, 1966, and thereafter conveyed it to Humble Oil Company. Commonwealth, however, did nothing in regard to the Bowers property until the present case arose in 1968.

In October 1967, Sun became interested in the Bowers property. After negotiations, study of the matter and the conclusion of a survey and title examination, took title to the property by deed on May 8, 1968, paying $50,-000.00 for the property to the Bowers. A representative of Sun—after the Bowers had signed the contract of sale with Sun, but prior to Sun's signing—learned that there had been a prior option on the property but was advised by counsel for the Bowers that it was no longer in effect. Sun had acquired the property to the north of the Bowers property and began construction on that property.

In June 1968 as a result of a casual conversation at luncheon, Commonwealth learned that Sun had purchased the Bowers property. A letter, on behalf of Commonwealth, was written Sun on June 26, which stated, in part:

> "My clients [Commonwealth] have presented me with sufficient papers to indicate to me that this option is still operable through breach by Bowers after due and proper notification. I have no objection to a full discussion of this cause and would prefer to resolve it without litigation and before involving local Washington County, Maryland co-counsel.
> "I await your advice."

Later Commonwealth tried unsuccessfully to get Sun to transfer the Bowers' property to Commonwealth for $18,000.00.

After the Bowers moved on July 25, 1968, Sun began work on the Bowers property, and has completed its service station on the Bowers and adjoining property to the north.

Commonwealth, on October 29, 1968, filed the bill of complaint, already mentioned.

As we have stated, the Chancellor filed a written opinion and a decree dismissing the bill of complaint for a variety of reasons. In his opinion he found as a fact that the Bowers "had no objection to tests being made and that their real objection was to the use of a backhoe digging large holes." He also found as a fact that Commonwealth had not made any application for a permit from the Health Department "in spite of the fact that the sole bone of contention was the digging of large holes" and that Commonwealth had recorded the option contract and "rested its case on the theory" that the $100.00 payment "tied up the property until someone called to make a deal" —paraphrasing a portion of the testimony of Benjamin Vinton, Jr., President of Commonwealth. The Chancellor concluded that there had been no breach by the Bowers of the option contract.

In construing the option contract, it will be observed that, by paragraph 2 it had a term of 180 days *or* if the permits mentioned in paragraph 4 "have not been finally issued or denied beyond appeal, until 15 days after such final action thereon." Then follows a provision that Commonwealth could renew the option contract for an additional period of 180 days "from the later of the above dates" by paying an additional consideration of $2.00 for each day of renewal.

Paragraph 4 recites the intended use of the premises for "a drive-in business" or for commercial purposes generally and provides the Bowers "shall sign all applications necessary to special or usual permits for such use to Buyer's [Commonwealth's] plans." Commonwealth "shall thereafter process such applications through the cognizant governmental departments." If the permits are refused or if title is not in order, the option agreement shall terminate at Commonwealth's option and all monies paid under the agreement returned. If terminated for any other reason by Commonwealth, no monies would be returned.

It will be observed that zoning approval and permits were not included in paragraph 4 but provisions in regard to them were stricken out by typewriting a line through those provisions.

The obligation of the Bowers was to sign necessary applications, but, as the Chancellor found, no Health Department application was ever presented to them for signature, so that there was no breach of this provision of the option contract by the Bowers.

Commonwealth maintains that there is no provision of the contract requiring it to present any application to the Bowers for their signatures and that it properly used an alternative method of obtaining Health Department approval by employing a recognized and qualified engineering firm to go forward with the percolation tests without previously obtaining a signed application by the Bowers, who breached the' option contract by refusing permission for entry and use by the engineering company of the back hoe. But as we have seen, the Chancellor found against Commonwealth on this issue and we do not think that he was in error in his conclusion.

Commonwealth contends, however, that, in any event, it properly recorded the option agreement and there could be no effective transfer of the Bowers' property until the permits had been issued, 15 days had elapsed or, if the 180 day additional period was renewed by Commonwealth, until the expiration of that period.

The Bowers, on the other hand, contend that the alternative period is subject to an implied condition precedent that Commonwealth must within the original 180 day term make application to the Health Department for a permit, but this was never done. They contend further that Commonwealth abandoned the option contract, was guilty of laches but, in any event, the alternative provision for duration of the contract—as construed by Commonwealth—is an unreasonable restraint on alienation and violates the rule against perpetuities.

As we have already indicated, we are of the opinion that assuming, *arguendo,* that there is no implied condi-

tion precedent, nevertheless, the alternative provision for duration of the option contract as construed by Commonwealth does violate the rule against perpetuities, and that even upon the contention of Commonwealth that the rule against perpetuities does not apply, the option contract is an unreasonable restraint on alienation and hence is unenforceable.

The Bowers and Sun, as we have stated, contend that the provisions of the option contract upon which Commonwealth relies and as construed by it, violates the rule against perpetuities and, in any event, is an unreasonable restraint on alienation. We have concluded that this contention is correct and we shall affirm the decree of the lower court.

Judge (later Chief Judge) Prescott, for the Court, in *Fitzpatrick v. Mercantile-Safe Deposit & Trust Co.*, 220 Md. 534, 540-41, 155 A. 2d 702 (1959) set forth a definition of the rule against perpetuities as follows:

> "It has frequently been said that no full, complete and comprehensive definition has ever been given of the Rule. Many courts and text-writers, however, have adopted the statement of Professor Gray that '[n]o interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest.' It sets out practically the same requirements that were enumerated in the previous appeal in this case, with the exception that the Court there stated that the period of time for an interest to vest was 'twenty-one years and ten months.' It is a rule of law, not one of construction, and it applies to legal and equitable estates of both realty and personalty. It is not a rule that invalidates interests which last too long, but interests which vest too remotely; in other words, the Rule is not concerned with the duration of estates, but the time of their vesting." (footnotes omitted.)

The rule against perpetuities and the rule that unreasonable restraints on alienation are void have the same common public policy, i.e., that property shall not be *extra commercium* for too long a period of time. Indeed, in some instances, the permissible duration of a restraint on alienation is the same as that of the rule against perpetuities. See 6, *American Law of Property,* § 26.66 (A. J. Casner ed. 1952).

The Courts, however, are properly cautioned against confusing the two rules, one dealing with the *vesting of estates,* the other with the *duration* of a restraint on alienation. Our predecessors had much difficulty in this regard, having confused the application of the rule against perpetuities with the *duration* of a limitation on alienation rather than the *time of vesting* of the interest involved in *Barnum v. Barnum,* 26 Md. 119 (1866), and having persisted in the error, in an intermittent way, until *Graham v. Whitridge,* 99 Md. 248 57 A. 609 (1904) when the Court returned to the correct doctrine. For an interesting and informative review of the Maryland cases on this subject, see Gray, *The Rule Against Perpetuities* (4th ed. 1942), § 245.2 (III), pages 250-255. Since *Graham v. Whitridge,* we have continued to embrace the orthodox interpretation of the rule against perpetuities as the above quotation from *Fitzpatrick* indicates. Even in *Fitzpatrick,* however, Judge Henderson, in his dissenting opinion, indicated that he thought that the majority of the Court had misapplied the correct rule in that particular case.

We must first determine whether the provision in the option contract comes within the ambit of the rule against perpetuities at all. Commonwealth contends that its right to exercise the option is a present vested absolute right so that there is no postponement of "vesting" within the scope of the Rule. We do not agree with this contention. Inasmuch as no health department permit has been issued—and will not be issued until Commonwealth presents an application for such a permit to the Bowers, their heirs and assigns — Commonwealth can postpone

the *vesting* of the fee simple estate in the Bowers' land indefinitely, i.e., for a period long beyond the period permitted by the Rule. The option contract creates in Commonwealth an equitable interest to exercise the option *in futuro*, contingent, however, upon Commonwealth (1) giving the notice required by paragraph 3 and (2) paying the $18,000.00 required to be paid by paragraph 1 of the option contract. There is no *present vested estate* in Commonwealth; the vesting of the fee simple estate in the land occurs when and if the option is exercised in the future by Commonwealth, notice given and the $18,-000.00 paid. The provision of the option contract relied on by Commonwealth comes within the purview of the Rule, and violates the Rule in that it may be exercised with a resulting vesting of the fee simple estate long after lives in being (and the period of gestation) as and when the option contract is exercised.

In the *Restatement of the Law of Property*, § 393 at 2315 (1944), it is stated:

> "Subject to exceptions stated in §§ 373 (destructible interest), 395 (option in a lessee), 397 (charity) and 400 (unissued shares of a corporation), the limitation of an option in favor of a person other than the conveyor is invalid because of the rule against perpetuities when, under the language and circumstances of the limitation, such option
>
> "(a) may continue for a period longer than the maximum period described in § 374; and
>
> "(b) would create an interest in land, or in some unique thing other than land, but for the rule against perpetuities"

The illustration given for § 393 is:

> "1. A, owning Blackacre in fee simple absolute, transfers to B and his heirs (or to B, a corporation) an otherwise effective and specifically

enforceable option to purchase Blackacre at a price of $50 per acre exercisable, in terms, at any time within fifty years. If this option were valid, the alienability of Blackacre would continue to be fettered for fifty years. The option is invalid and B has no interest in Blackacre."

See also Simes and Smith, *The Law of Future Interests*, § 1244 at 156-63 (2nd ed. 1936).

The cases in this country and apparently in England are in accord with this statement of the law.

A recent case involving a similar type of option is *Middleton v. Western Coal and Mining Co.*, 241 F. Supp. 407 (W.D. Ark. 1965), *aff'd; Western Coal and Mining Co. v. Middleton*, 362 F. 2d 48 (8 Cir. 1966). In *Middleton* on April 2, 1904, the then owners in fee simple of a tract of land in Sebastian County, Arkansas sold the "coal, fire clay and other minerals contained within and underlying" the tract to Western Coal and Mining Company (Western). In the 1904 deed the following provision appeared:

" 'Provided, that so much of the surface of said grounds as to Western Coal and Mining Company, its successors or assigns, may at any time elect to take under the provisions of this deed it shall pay to the said Franklin Bache, his heirs, executors, administrators or assigns, an amount of money to be agreed on between the parties hereto.' "
(241 F. Supp. at 417.)

Then followed a provision to insure a determination of the purchase price in the event of disagreement in regard to it. The "use" of the surface by Western was conditioned upon Western's electing to take the desired surface in fee and paying the purchase price. The tract was ultimately sold to the plaintiffs, Middleton, et al., who wished to subdivide the tract for the sale of residential building lots but found the option of Western to be a cloud on their

title. The plaintiffs filed a bill of complaint in the state court in Arkansas to quiet their title and to have the option declared void. This suit was removed to the United States District Court for the Western District of Arkansas because of diversity of citizenship. Chief Judge John E. Miller of the District Court declared the option null and void as violating the rule against perpetuities.

After reciting the facts and the provisions of the rule against perpetuities as applied in the state courts of Arkansas (they are the same as in Maryland), Chief Judge Miller stated:

> "The rule against perpetuities, of course, is no more than a prohibition against the attempted creation of estates in fee which depend for their vesting upon a contingency to take place sometime in the future without limitation. A contingency which is capable of vesting the interest in fee simple in lives in being plus 21 years does not violate the rule against perpetuities. An interest in the surface in fee in the nature of an option or an election which grants a contingent interest, the exercise of which depends upon the discretion of the grantee and its successors or assigns and without any limitation as to time, unduly encumbers the alienation of the estate and constitutes a cloud upon the title.
>
> "The rule against perpetuities, as applied to options to purchase real property, is well but briefly stated in 162 A.L.R., Annotation, beginning at page 581, as follows:
>
> > " 'According to the weight of authority in jurisdictions applying the common-law rule against perpetuities, an option to purchase real property, unlimited as to the time for its exercise or extending beyond the period limited by the rule against perpetuities, violates such rule and is invalid.' "
>
> "The plaintiffs in their brief cite and rely up-

on *Barton v. Thaw*, 246 Pa. 348, 92 A. 312, (1914), in which the court, in analyzing the interest created in an option to purchase the surface in fee, made the following statement with respect to the rule against perpetuities:

" 'The case turns very largely upon the character of the interest in the surface which the optionees took under the covenant. If it was a present, fixed, and vested interest in the land, the rule against perpetuities would have no application. But is a mere option to purchase land, unlimited as to time and indefinite in duration, which may be exercised in 10 years, or in 100 years, or in 1,000 years, or which may never be exercised at all, depending upon the wish and pleasure of the optionee, a present vested interest? To ask this question would seem to answer it. In no proper legal sense can a mere privilege of exercising a future right to purchase be deemed a present vested interest in land. The optionees may never exercise their option, and, failing to do so, they would never acquire a vested interest in the land.' "

"The above quoted portion seems particularly applicable in the instant controversy as Western, by virtue of the election provision of the Bache deed, was granted an option to purchase the surface in fee which was unlimited in time and of indefinite duration. The defendants contend that this election to take the surface does not constitute a cloud upon the plaintiffs' title as it granted Western no more right in the surface than it impliedly received by virtue of its grant of the mineral estate in fee. The plaintiffs, however, contend that the election to take the surface for a price to be agreed upon in the future is in effect a grant of an interest in the sur-

face in fee, contingent upon the defendants in their discretion exercising it at some time subsequent to April 2, 1904. The provision with respect to taking the surface does on its face reflect an attempt to create in Western and its assigns or successors the power to succeed to the surface in fee. This provision creates a future estate in the sense that Western and its assigns or successors may become the absolute owner in fee of the surface by the exercise of the election granted. The vesting of the estate in fee simple depends, of course, upon the exercising of the election. The vesting is therefore contingent upon the grantees' making an election in the future. This interest in the surface is thus capable of becoming an ownership in fee simple, and is therefore an attempt to create a future interest, the vesting of which is contingent with no time limitation upon the contingency.

"To sustain this option would give the grantee, Western, its assigns and successors, an election to acquire the surface in fee simple without any limitation as to time, and would thus violate the rule against perpetuities. The underlying purpose of the rule against perpetuities is to prevent such restrictions upon the alienability of property which has the effect of indefinitely encumbering it."

(241 F. Supp. 417, 418.)

In accord with the holding in *Middleton* are the following cases in the United States: *Morgan v. Griffith Realty Co.,* 192 F. 2d 597 (10 Cir. 1951), *cert. denied,* 343 U. S. 934, 72 S. Ct. 770, 96 L. Ed. 1342; *Barton v. Thaw,* 246 Pa. 348, 92 A. 312 (1914)—cited with approval and followed in *Middleton, supra* —; *Schwren v. Falls,* 170 N. C. 251, 87 S. E. 49, L.R.A. 1916 B, 1235 (1915); *Neustadt v. Pearce,* 145 Conn. 403, 143 A. 2d 437 (1958); *H. J. Lewis Oyster Co. v. West,* 93 Conn. 518, 107 A.

138 (1919) ; *Eastman Marble Co. v. Vermont Marble Co.,* 236 Mass. 138, 128 N. E. 177 (1920) ; *Starcher Bros. v. Duty,* 61 W. Va. 373, 56 S. E. 524, 9 L.R.A. (N.S.) 913, 123 Am.St.Rep. 990 (1907) ; *Henderson v. Bell,* 103 Kan. 422, 173 P. 1124 (1918) ; *Rocky Mountain Fuel Co. v. Heflin,* 148 Colo. 415, 366 P. 2d 577 (1961) ; *Gange v. Hayes,* 193 Or. 51, 237 P. 2d 196 (1951) ; *Skeen v. Clinchfield Coal Corp.,* 137 Va. 397, 119 S. E. 89 (1923) ; *Hall v. Crocker,* 192 Tenn. 506, 241 S.W.2d 548 (1951) ; *Robertson v. Simmons,* 322 S.W.2d 476 (Ky. 1959) ; *Melcher v. Camp,* 435 P. 2d 107 (Okl. 1967) ; *Turner v. Peacock,* 153 Ga. 870, 113 S. E. 585 (1922).

In England there has been some difficulty about this matter, but the law in that jurisdiction appears to be settled by *London & S.W.R. Co. v. Gomm,* (1882) L.R. 20 Ch.D. 562 overruling *Birmingham Canal Co. v. Cartwright,* (1879) L.R. 11 Ch.D. 421. But see *Woodall v. Clifton* [1905] 2 Ch. 257, *aff'd* [1905] 2 Ch. 266.

See Annotation "Perpetuities—Options to Purchase," 162 A.L.R. 581-605, particularly at pages 603-05; Leach, *Perpetuities In A Nutshell,* 51 Harv.L.Rev. 638, 660-62 (1938) ; *Developments in the Law—Future Interests,* 48 Harv.L.Rev. 1202, pp. 1253-58 (1935) ; Recent Important Decisions, *Rule Against Perpetuities — As Applied To Options,* 22 Mich.L.Rev. 279, 280 (1924) ; Note, *The Rule Against Perpetuities as Applied to Contracts,* 25 Colum.L.Rev. 77 (1925) ; Simonton, *Oil And Gas Leases And The Rule Against Perpetuities,* 25 W.Va.L.Quar. 30 (1918) and the case note in the same volume by Professor Simonton at page 236; Note, *Options of Purchase,* 38 Canadian Law Times 242 (1918), and particularly the interesting and critical consideration of *London and S.W.R. Co. v. Gomm, supra,* and other English cases at pages 322-334.

An especially helpful and provocative Law Review Article is by Albert Langeluttig entitled "Options To Purchase And The Rule Against Perpetuities," 17 Va.L.Rev. 461-472 (1931) in which the origin of the rule against

perpetuities is traced and a number of cases involving options to purchase are considered. In the author's opinion, options should be divided into two principal classifications: (1) options appendant to leases and (2) options in gross. Options appendant should not violate the rule against perpetuities, but options in gross (such as the one we have in the present case) should be held void if the interest may vest beyond the period of the Rule. The author's view is, however, that *all* options in gross for a longer period than five years should be held void as an unreasonable restraint on alienation. He states:

> "The real objection to options in gross is that by the use of such options an individual, or a small group, at small cost could obtain control of, and dictate the use of, huge bodies of land. The same policy which lies back of the mortmain acts and the acts limiting the power of corporations to hold land, should prohibit this use of the device of long term options. It is believed that, following the lead of the Bauer case, an option in gross for a longer term than five years should be held bad as contrary to public policy. The same arm of government that created the rule against perpetuities can recognize the other rule of public policy evidenced everywhere in the law—a policy against the too close control of the use of land."
> (17 Va.L.Rev. p. 471.)

See also 2 Tiffany, *Real Property,* § 405 at 168-70 (3rd ed. 1939) ; 70 C.J.S., *Perpetuities,* § 13 c and 41 Am. Jur., *Perpetuities and Restraints on Alienation,* §§ 40 and 41 (1942).

Assuming, *arguendo,* that Commonwealth's contention —that the option is not within the purview of the rule against perpetuities as having created a present vested interest—nevertheless Commonwealth would then be unable to enforce the provision in the option contract relied on by it, because it would be void as an unreasonable

restraint on alienation, 6 *American Law of Property*, § 26.15 at 429. Indeed, Professor Merrill I. Schnebly of the University of Illinois College of Law, the author of Part 26 "Restraints Upon the Alienation of Property" in 6 *American Law of Property*, is of the opinion that it would have been wiser to have applied the rule against restraints on alienation, with suitable adaptations, to all cases involving options rather than to have applied the rule against perpetuities to some options and not to others with resulting nice and subtle distinctions. *Id.* § 26.66, p. 509. See *Missouri State Highway Commisison v. Stone,* 311 S.W.2d 588 (Mo.App.Ct. 1958) holding an option to purchase, somewhat similar to the one in the present case, void as an unreasonable restraint on alienation.

The option held void in the instant case is to be distinguished from options appendant to leases (see *Restatement of Property, Perpetuities and Other Restrictions,* § 395) and from limitations by corporation in regard to its unissued shares (*Id.* § 400). The decision of our predecessors in *Hollander v. Central Metal & Supply Co.,* 109 Md. 131, 71 A. 442 (1908) is not impaired in any way by our decision in the present case. The decision in *Hollander* involved a covenant for perpetual renewal of a 99 year lease and a covenant to convey the fee upon the payment of $600.00 and accrued rent. These covenants involving the ground rent system in Maryland do not place any property *extra commercium,* are not within the policy underlying the rule against perpetuities and are a recognized exception in this State to the application of the Rule.

> *Decree affirmed, the appellants to pay the costs.*